Argued at Pendleton May 1; affirmed June 27; rehearing denied July 11, 1933

# BUNCH *v.* STANDARD OIL CO. OF CALIFORNIA ET AL.

**(23 P. (2d) 328)**

[1]

*Blaine Hallock* and *Harold H. Banta,* both of Baker (Hallock, Donald & Banta, of Baker, on the brief), for appellant.

*John F. Reilly,* of Portland (Wilson & Reilly, of Portland, on the brief), for respondent Standard Oil Company.

BAILEY, J. The principal error assigned by plaintiff on this appeal is the action of the trial court in granting the motion of the defendant Standard Oil Company of California for a directed verdict. This necessitates a review of the evidence.

The plaintiff's contention is that defendant Shaw was, at the time of the accident, employed by the corporate defendant and was then acting within the scope of his employment. The accident occurred on Sunday, September 20, 1931. The defendant Shaw was at that time, and for more than two years prior thereto had been, employed by the defendant corporation on a monthly salary. He was stationed at Baker, Oregon,

where he was employed as an area salesman, delivering petroleum products by tank truck from the plant of the defendant corporation located in that city. Shaw also served the company as relief man at or in the vicinity of Robinette, Huntington and North Powder in Baker county, and probably at Prairie City in Grant county, when the employees in charge of the company's business at those places were on vacation or absent from duty for other reasons. At such places the company maintained plants for storing gasoline and other petroleum products, from which it delivered products to its customers by company-owned trucks kept at said places.

The employees of the defendant corporation in charge of these different plants wore uniforms consisting of stiff-brimmed caps bearing across the front band the words "Standard Oil Company", also soft shirts and riding breeches with belt, all of olive-drab color, and puttee leggings or high-topped leather boots. These employees had charge of sales and made deliveries from the plants to the company's customers or to the stations.

On September 4, 1931, orders were given Shaw to go the following day to Huntington, some 48 miles from Baker, to relieve for two weeks one Haggman, who was in charge of the plant at that place. About four o'clock the next morning Shaw left Baker in his Chevrolet automobile, wearing the regulation uniform, and arrived at Huntington between six and seven. During the day he familiarized himself with the business at the Huntington plant. He had brought no clothing with him other than what he was wearing. That evening he returned to Baker, where he maintained a room and kept his clothes even during the time he was employed away from Baker.

On the next day, Sunday, September 6, he made a shipment of gasoline from the Baker plant, and returned the same evening or the next morning to Huntington. At that time he took with him a change of underwear and some toilet articles, but continued to wear the company uniform as on the previous occasion.

Shaw did not remember whether or not he returned to Baker the following week, but on Saturday, September 19, between four and five o'clock in the afternoon, he left Huntington for Baker, to get fresh clothing and to attend a dance, with the expectation of returning to Huntington late Sunday afternoon or early Monday morning. The evidence is vague as to what Shaw did relative to attending the dance. For some unexplained reason he left Baker to return to Huntington earlier than he had expected, starting for the latter place between 11 and 12 o'clock in the forenoon. He then wore his uniform and was driving his own car.

When he was about 18 miles east of Baker and some 30 miles west of Huntington the accident occurred.

Evidence was introduced, over the company's objection, that Shaw, immediately after the accident, stated: "I am Mr. Shaw. I am working for the Standard Oil Company. I am on my way to Huntington now to turn over (the plant) to another man who is on his vacation". Further evidence, also over the company's objection, was introduced to the effect that Shaw stated the following day, in the office of plaintiff's doctor, that he was hurrying back to Huntington and that, "I have a customer waiting there, at noon".

The company maintained at Huntington a Ford model-T tank truck, a Ford model-T package truck and a Graham tank truck. There is no claim made by plaintiff that Shaw's Chevrolet car was ever used by him

or any one else in making deliveries. Plaintiff, however, does contend that this car was used in the company's business, inasmuch as Shaw, with the knowledge of the company, used it as a means of transportation whenever he was assigned to duty at any of the plants in the Baker area, which included the plants above mentioned. There was no allowance made by the company for the use of the car.

When sales were made by any of the employees in charge of the company's plants, delivery invoices were made out in quadruplicate, showing the date of sale, the products, and by and to whom sold. There were introduced in evidence by plaintiff two of these invoices used at the Huntington plant, signed by Shaw and dated September 20, 1931. Shaw, however, stated that he had not sold or delivered any petroleum products on that date. His testimony was corroborated by other witnesses as to the sale represented by one of these invoices, but not as to the other.

For some time before Shaw was sent to Huntington, Haggman had been working at least part of his Sundays in making deliveries to contractors engaged in road work in the Huntington district. That work had practically ceased by the time Haggman took his vacation. The company gave no orders to its employees at the plants to make deliveries on Sunday. If, however, some of its customers needed additional supplies on Sunday, the employees, if available, would generally accommodate them. When such employees worked overtime or on Sunday they would be at liberty to take time off during the week following.

The company's local manager was stationed at Baker and had charge of all of Baker county and part of Grant and Union counties, and consequently had

supervision over the plants above mentioned. Deliveries from the Huntington plant were made as far as 19 miles west of that place and some 12 miles east of the scene of the accident.

After finishing their day's work, employees of the defendant company were not within its control. Shaw did not communicate to any employee of the company the fact that he was going to Baker on Saturday, September 19. He did not see or communicate with any of the company's employees while at Baker. He had not been ordered to go to Baker on that day or to return to Huntington the next day, nor did he consult with any employee about going.

The foregoing contains practically all the facts pertaining to the question of whether or not Shaw was, at the time of the accident, acting within the scope of his employment.

We need not here consider the question of Shaw's negligence in causing the accident, for he has not appealed and there is no contention made by the company that the evidence does not warrant a verdict against him, and against the company as well, if Shaw was, at the time of the accident, acting within the scope of his employment.

The appellant summarizes the reasons why the case should have been submitted to the jury, as follows: (1) Shaw was in the company's general employ; (2) he maintained residential headquarters at Baker but was sent to Huntington by the company's general representative at Baker to relieve the representative at Huntington, and the accident occurred between those two points while he was making the trip; (3) at the time of the accident Shaw was wearing the regular company uniform, including the cap bearing the words, "Standard Oil Company"; (4) immediately following

the impact and as part of the *res gestae*, Shaw stated that he was working for the Standard Oil Company and was then on his way to turn over the plant to the company's representative at Huntington; (5) he drove straight to the company's headquarters upon his arrival at Huntington; and (6) Shaw told Dr. Fouch in the presence of plaintiff that he was hurrying back to Huntington to make a delivery for the company to one of its customers.

The evidence is undisputed that Shaw was employed by the defendant corporation on a monthly salary, working eight hours a day and six days a week. The fact that he was thus employed is no evidence that the relation of master and servant or principal and agent obtained between the company and Shaw at the time of the injury to plaintiff.

In support of his contention that the jury might infer that Shaw was acting within the scope of his employment from the fact that he was wearing the regulation uniform of employees of the defendant corporation and that his cap bore the words "Standard Oil Company", appellant directs our attention to a number of Western Union Telegraph Company cases, to wit: *Phillips v. Western Union Telegraph Company,* 194 Mo. App. 458 (184 S. W. 958); *Western Union Telegraph Company v. Lamb,* 140 Tenn. 107 (203 S. W. 752); *Western Union Telegraph Company v. Hale,* 277 Fed. 422; *Western Union Telegraph Company v. Scrivener,* 18 Fed. (2d) 162; and *Western Union Telegraph Co. v. Brown* (Tex. Civ. App.), 297 S. W. 267.

In *Phillips v. Western Union Telegraph Company,* supra, plaintiff's action was based upon injuries to his wife. The latter, while standing on a sidewalk, was knocked down by a boy between 16 and 17 years of age,

who wore the uniform of the Western Union Telegraph Company and had the name of that company on his cap. He had in his hand one of the ordinary envelopes used by the company for the delivery of messages. After hitting plaintiff's wife the boy ran into the branch office of the company. He was shown to be on duty at that time as a messenger. The only evidence which was introduced by the company was a diagram of the place of the accident and some testimony to contradict statements by plaintiff as to his loss of earnings while in attendance upon his wife. At the close of testimony the company moved for a directed verdict. No attempt was made on behalf of defendant to show the nature of the messenger's employment or to contradict the inference which the court said might be drawn from the facts related by the court, which have been but briefly touched upon here. In discussing the inference which might be drawn from the testimony and the fact that the company did not attempt to refute the same, the court said:

"The jury, as men of ordinary intelligence, had a right to infer that when they had the testimony before them that Kenzell was a messenger boy in the employ of the Western Union, clothed in its usual uniform, going along the street in the direction of one of the branch offices of that company, carrying in his hand an envelope recognized as the envelope ordinarily used by the Western Union in the transaction of its business, that he was at the time in the discharge of the duties of his employment. It certainly behooved defendant in the light of the evidence introduced by plaintiff, and it was within its power to meet this and to show, if that was the fact, that at the time of this accident this messenger boy was not engaged in the discharge of his duties as such at the time. That defendant did not attempt to do this undoubtedly led the jury to conclude that the appellant was unable to do so".

In *Western Union Telegraph Company v. Lamb,* supra, the plaintiff was run into by a boy on a bicycle and was seriously injured. This boy had the words "Western Union" on his cap and was also wearing a Western Union uniform. In addition, he was carrying in his hand a pad provided by the company for the use of its messengers while receiving and delivering messages. After striking the plaintiff the boy was seen to go immediately to the office of the defendant company, parking his bicycle on a side street which was used by messenger boys. The defendant introduced no testimony, and the court held that it was within the power of defendant to explain fully what the truth was concerning the scope of the messenger's employment. "If", said the court, "it were true that the boy was not within the scope of his duty at the time, or that he was not in its employment, this could have been shown beyond reasonable doubt, and the defendant could have been fully exonerated".

*Western Union Telegraph Company v. Hale,* supra, is similar in many respects to the last case discussed. There, too, the defendant failed to introduce any testimony relative to the employment and duties of the messenger boy. "If the facts were not as indicated by plaintiff's evidence", the court there said, "they were peculiarly within defendant's knowledge and could have been produced by it without difficulty or inconvenience. Its silence and failure to offer any evidence under the circumstances warrant the conclusion that it was deprived of no right and suffered no injury by reason of the court's refusal to grant its motion for a directed verdict".

*Western Union Telegraph Company v. Scrivener,* supra, is like the above cases involving the same company. In that instance the defendant failed to intro-

duce testimony concerning the duties and scope of employment of the messenger boy. The court, referring to this matter, quoted with approval the opinion in *Western Union Company v. Lamb,* supra, as follows:

" 'Another rule of evidence, which is often resorted to to explain incomplete knowledge, is that where the evidence tends to fix liability on the defendant, and if he has it in his power to offer evidence to rebut the unfavorable inferences which the proof tends to establish, and neglects or refuses to offer such proof, it may be inferred from the facts shown that the fully developed evidence would establish liability upon his part' ": citing numerous authorities.

*Western Union Telegraph Company v. Brown,* supra, is the last of the series of cases cited by appellant involving the liability of the company by reason of the neglignece of its servants. In that case Mrs. Brown was struck by a messenger boy riding a bicycle and wearing the regulation uniform of the Western Union Telegraph Company. Evidence was introduced to the effect that all of the company's messengers in the city in which the accident occurred were required to wear uniforms and ride bicycles, and that there were no boys riding bicycles and wearing such uniforms except those employed by the company. The court held that the evidence was sufficient to carry the case to the jury, in the absence of testimony showing that the boy was not in the employment of the telegraph company at the time of the accident.

*Fleishman v. Polar Wave Ice & Fuel Company,* 148 Mo. App. 117 (127 S. W. 660), is relied upon by appellant and has often been referred to by other courts in connection with the question which is here under consideration. There the plaintiff was knocked down and injured by a wagon standing along the side of the street, which was run into by another wagon having on

its side the words "Polar Wave Ice Company". The latter wagon was similar to many wagons used by defendant and seen in its yards in the neighborhood of the accident, and unlike any other wagons used in that vicinity. After the accident the defendant sent a physician to examine the plaintiff and ascertain the extent of her injuries. The court held that this constituted sufficient evidence to require the submission of the case to the jury, in the absence of any testimony on behalf of the defendant to prove that the wagon did not belong to it and was not in charge of one of its servants.

In the case of *Tieman v. Red Top Cab Company*, 117 Cal. App. 40 (3 P. (2d) 381), cited by appellant, the plaintiff was injured by a taxicab having on its side the defendant's name and being driven by a chauffeur wearing the defendant company's uniform. The defendant failed to introduce testimony showing that the taxicab was not owned by it or that the driver was not in its employ. The court held that the facts were sufficient to sustain a verdict in favor of plaintiff, remarking that: "It is a well settled rule that when the evidence tends to prove a material fact which imposes a liability on a party, and he has it in his power to produce evidence which from its very nature must overthrow the case made against him if it is not founded on fact, and he refuses to produce such evidence, the presumption arises that the evidence if produced, would operate to his prejudice, and support the case of his adversary".

The facts in the foregoing adjudications are in many respects unlike those in the present case. In order to avoid the consummation of an injustice, and when the facts are peculiarly within the knowledge of the opposite party litigant, the courts have relaxed as to the *quantum* of proof required of plaintiff to entitle

him to have his case submitted to the jury, in the absence of any evidence on behalf of the defendant. All the foregoing cases relied upon by plaintiff are distinguished by that feature.

We have present here evidence that the automobile causing the injury was not owned by the defendant company and was not used in that company's business, with the possible exception, if that be an exception, of the time it was being used by Shaw when going to some plant of the company to relieve one of its regular employees, or to return to Baker after so doing. The wearing of the regulation uniform of the company by Shaw at the time of the accident is satisfactorily explained. He left all his other clothing at Baker and consequently wore the uniform when not at home. The scene of the accident was beyond the limit for making deliveries from the Huntington plant. The accident occurred on Sunday and Shaw was not then on duty. He had not been ordered to go to Baker on the previous day or to return to Huntington on that day, and even though he was "hurrying back to Huntington to serve" some customer, that circumstance would not tend to show that he was on the company's business at the time of the accident.

In the Western Union cases the messenger boys causing the injuries were within the ages ordinarily employed by that company and were not only wearing the company's uniform but were also apparently doing what they were accustomed to do when in the company's employ and were doing the same in the manner and places usual to their employment.

In furtherance of appellant's contention that the jury might have inferred from the facts proved that Shaw was at the time of the accident acting within the scope of his employment, our attention is directed to

numerous decisions of this court to the effect that proof of the ownership of the automobile causing the damage creates a presumption that the one operating it was at the time thereof an employee of the owner of the automobile, as suggesting an analogy between these Oregon precedents and the Western Union cases.

We are unable to see how the reasoning in such decisions of this court has any application to the case at bar. If proof of ownership of the automobile creates a presumption, or an inference can be drawn therefrom, that the one operating it is in rightful possession thereof and is operating it on behalf of the owner of the automobile, then we are inevitably led to the conclusion that because Shaw was the owner of the automobile driven by him at the time of the accident, he was operating it for his own purposes and not as an employee of the defendant corporation. An automobile, as has been pointed out in numerous decisions, is a valuable piece of personal property and is usually driven by the owner or his agent. Hence, the ownership thereof may logically tend to prove that when the automobile is being driven by some one other than the owner it is being so driven by his agent. If the facts in this case proved that Shaw was, at the very time of the accident, in the employ of the defendant corporation, certain inferences might possibly be drawn therefrom. But we are asked to find from the evidence sufficient facts from which the inference may be drawn that Shaw was, at the time of the accident, in the employ of the company and acting within the scope of that employment.

We are not here concerned with what might have been the liability of the defendant corporation, had Shaw on his initial trip to Huntington in his automo-

bile, to talk over the work of the employee who was going on his vacation, injured some one on the highway.

The appellant has cited numerous authorities to the effect that the employer is liable for damages caused by the employee while operating his own car. Those cases, however, can have no application here, for the reason that the employee in each of the instances cited was found to be acting within the scope of his employment at the time of the accident.

Any evidence in the case from which an inference might have been drawn that Shaw was, at the time of the accident, acting within the scope of his employment, was overcome by direct testimony concerning his duties in connection with his employment. Even though it were customary, as appellant contends, for the defendant company to make deliveries from its plant at Huntington on Sunday, that circumstance would in nowise tend to prove that Shaw was about the company's business while making the trip to and from Baker during the time he was stationed at Huntington.

Several other assignments of error are referred to in appellant's brief. They have to do with the rejection of corroborating evidence as to the uniform worn by Shaw, the statement made by him to Dr. Fouch, and the court's exclusion of certain delivery slips after they had once been admitted in evidence. In view of what has above been said, no further consideration need be given these assignments of error.

Although the plaintiff appealed from the entire judgment, both as to the defendant corporation and as to Shaw, no contention is made here by him that the judgment against Shaw was erroneous. The judgment appealed from, therefore, both as to Shaw and the Standard Oil Company, is affirmed.

ROSSMAN, BEAN and CAMPBELL, JJ., concur.