Argued October 30, 1972, affirmed April 2, petition for
rehearing denied May 15, 1973

PALMER, *Appellant, v.* VAN PETTEN
LUMBER CO., *Respondent.*

509 P2d 420

*Charles R. Cater,* La Grande, argued the cause and filed a brief for appellant.

*James A. Monce,* La Grande, argued the cause for respondent. With him on the brief were Carl G. Helm and Helm & Wasley, La Grande.

O'CONNELL, C.J.

This is an action to recover damages for personal injuries which plaintiff suffered when defendant's truck collided with plaintiff's automobile. Plaintiff appeals from a judgment of nonsuit.

At the time of the accident defendant's truck was in the possession of Frank Lovely, one of defendant's employees. In the absence of rebutting testimony, this fact would give rise to an inference of agency.[1]

---

[1] Judson v. Bee Hive Auto Service Co., 136 Or 1, 294 P 588, 297 P 1050, 74 ALR 944 (1931); Kowaleski v. Kowaleski, 235 Or 454, 385 P2d 611 (1963).

The trial court held, however, that the inference was rebutted by the evidence adduced in this case. The evidence rebutting the inference was the uncontradicted testimony of several witnesses for defendant. The issue on appeal is whether there was any evidence other than the uncontradicted testimony of defendant's witnesses from which the jury could have reasonably inferred that Lovely was acting as defendant's servant at the time of the accident.

■ We begin with the well-established principle that the credibility of witnesses is ordinarily to be determined by the jury. We carefully examined this generalization in *Rickard v. Ellis,* 230 Or 46, 51, 368 P2d 396 (1962), observing that "[i]n some cases an issue upon which there is uncontradicted testimony is properly submitted to the jury; on the other hand in some cases the question of the credibility of a witness is properly withheld from the jury." We re-asserted the test adopted in *Wiebe v. Seely, Administrator,* 215 Or 331, 343-344, 335 P2d 379 (1958),[2] and elaborated upon it by noting two important factors to be considered in deciding whether the jury should be permitted to draw inferences contrary to the uncontradicted testimony. The factors were (1) the availa-

[2] The test was adopted from Ferdinand v. Agricultural Ins. Co., 22 NJ 482, 126 A2d 323, 62 ALR2d 1179 (1956) which stated it as follows: " "* * * Where men of reason and fairness may entertain differing views as to the truth of testimony, whether it be uncontradicted, uncontroverted or even undisputed, evidence of such a character is for the jury. * * * [Citing cases]. But when the testimony of witnesses, interested in the event or otherwise, is clear and convincing, not incredible in the light of general knowledge and common experience, not extraordinary, not contradicted in any way by witnesses or circumstances, and so plain and complete that disbelief of the story could not reasonably arise in the rational process of an ordinarily intelligent mind, then a question has been presented for the court to decide and not the jury.' " 230 Or at 51, 368 P2d at 398.

bility of evidence to contradict the witness's statement, and (2) the likelihood that the witness's interest in the litigation may tempt him to testify falsely.

The general standard to be applied in determining whether a case should be submitted to the jury is well stated in *Jerke v. Delmont State Bank,* 54 S D 446, 456, 223 NW 585 (1929) and endorsed by 9 Wigmore on Evidence, § 2495, p. 306 (1940) as expounding "the correct principle with inexorable logic." The court, after noting that "We are too often prone to exaggerate the powers and privileges of a jury as a trier of facts," reminds us that "the general superintendence and control of the court and all its machinery, including the jury, rests with the judge, and [that] it is fundamental that an issue arising between litigants must be tried by a general, rational, or reasoning process, both as to the ascertaining of facts and the application of the law." Going on, the court says:

"* * * Before there is anything for submission to the jury, the evidence offered as to the ultimate facts must be such that the application of normal intellectual faculties thereto might by the customary and normal processes of reasoning arrive at different judgments or conclusions. * * * * *

"Jurors do not determine all questions of ultimate fact, even in jury cases. They determine the existence or nonexistence of those facts, and those only, with reference to the existence of which the judgment of reasonable men might differ as a result of their intellectual faculties to the evidence." 54 S D at 457-458.

The court, turning to the specific question of the effect to be given the factor of credibility, said:

"* * * But the entry of the factor of credibility, either one way or the other, can make no difference in the operation of the fundamental

principle which necessarily underlies the direction of verdicts in all cases. The question of whether reasonable minds could arrive by reasoning process at more than one opinion or conclusion is always a question for the judge. The entry of the factor of credibility means simply the existence of one more item upon which the intellectual faculties are to operate. * * *

"A jury has no greater or better right to act arbitrarily or unreasonably in forming a judgment or opinion as to whether or not a witness speaks the truth than it has to act unreasonably in arriving at any other opinion or conclusion. Forming an opinion as to credibility should be just as much a process of rationalization or reasoning from the data presented in the light of human experience as the formation of any other opinion or judgment in a court, and this has always been recognized by the great majority of the courts, and the proposition, subject to various qualifications, has been laid down in some such phrasing as that 'the positive testimony of a disinterested, uncontradicted witness cannot be arbitrarily or capriciously disregarded by the jury.'" 54 S D at 459-460.

With this general background of the applicable principles, we now turn to a more detailed statement of the facts.

Defendant was engaged in the roofing business, which was conducted along with a retail lumber business. Frank Lovely was employed by defendant as foreman of its roofing crew. Lovely used a pick-up truck owned by defendant in carrying out his duties as foreman of the crew. According to the testimony of Lovely and John Whittemore, former manager of defendant's business, Lovely was permitted to keep the pick-up truck in his possession, not only when he was performing his regular daily duties but also after

regular working hours. Lovely provided a garage for the truck and was permitted to use the truck for his own personal use whenever it was not being used for his employer's purposes. Defendant provided all the fuel for the pick-up.

During the evening hours Lovely was subject to call by defendant in the event of an emergency requiring the temporary repair of a roof. For this purpose, the truck carried a few tools and supplies belonging to defendant.

On the evening of the accident Lovely had driven the truck over to the residence of Robert Hansen, who was also employed by defendant and worked on Lovely's roofing crew. Lovely parked the truck on the street in front of Hansen's house. While the truck was unattended it rolled down the street and collided with plaintiff's automobile, causing the personal injuries for which this action is brought. Both Lovely and Hansen testified that the purpose of Lovely's visit was to pick up Hansen, who by previous arrangement had been employed by Lovely to help Lovely remodel one of his own rental houses.

Upon examination by plaintiff's counsel, Hansen testified as follows:

"Q   All right. On the evening we're talking about, Mr. Lovely came to your door, knocked, you went to the door; right?
"A   Yes.

"Q   All right. What happened then?
"A   He came in. I got my coat and hat.

"Q   Well, what did he say when he came in?
"A   Well, he asked me if I was ready to go. I was going out to his place to help him put up some sheet rock on his house.

"Q   And did he ask you the status of the job you had been working on for Van Petten that day?

"A   No.

"* * * * *

"Q   Now, you and I talked about this, didn't we, Mr. Hansen?

"A   Yes.

"Q   And you told me what had happened there, didn't you?

"A   Yes.

"Q   Didn't you tell me that he asked you if you had finished the job that you were doing for Van Petten that day?

"[Objection]

"Q   You tell us all that was said there, Mr. Hansen, when Mr. Lovely came to your place that night.

"A   It's been quite awhile ago. He came in, asked me, — He came in. He asked me if I was ready to go. I said, 'Yes, I'll get my coat.' I got my coat and hat. When we started out, he said, 'Did you get done with your job?'

"THE COURT:   * * * What did he say?

"THE WITNESS:   He said was I about ready to go. I said, 'Yes.' I got my coat and hat. As we was going out, he said, 'How did you fellows do today?'

"THE COURT:   What?

"THE WITNESS:   'How did you fellows do today?'

"BY MR. CATER:

"Q   What did he have reference to, Mr. Hansen?

"A   That could cover a lot of things.

"Q Yeah, but you knew what he meant, didn't you?

"A Yes, I knew what he meant. The job we were working on, he asked me how we had done. That was all.

"Q This was the work that you did for Van Petten Lumber Company that day?

"A Yes.

"Q That he was asking you about?

"A Yes.

"* * * * * *

"Q Had he [Lovely] been present on that roofing job that you were working on for Van Petten on that particular day?

"A He was in the morning.

"Q Then in the afternoon, he wasn't there?

"A Not to my knowledge.

"Q So he was asking you what happened in the afternoon; is that right?

"[Objection sustained]

"Q What did you tell him in answer to his question?

"A I never answered him.

"Q You never answered him?

"A No.

"Q How come?

"A Because there was a lady at the door. As we walked out, we met this lady there."

Upon examination by defendant's counsel, Hansen testified that Lovely had employed him to work for Lovely in remodelling a house owned by Lovely, for which Hansen was to be paid. On previous occasions Hansen had worked for Lovely on a similar arrangement and was paid by check.

In describing the visit to Hansen's home, Lovely,

when examined by plaintiff's counsel, testified as follows:

"Q What did you say to Mr. Hansen?
"A Asked him if he was ready to go.

"Q And what else?
"A I don't recall anything.

"Q Did you ask him about the condition or progress of the job that he'd been working on for Van Petten that day?
"A Not that I recall.

"Q You don't recall that?
"A No, sir, I don't remember asking him of anything.

"Q Did you hear him say that you asked him how he got along with the job that day?
"A I don't remember of it."

Defendant's counsel elicited the following testimony:

"Q * * * What was your arrangement with Mr. Hansen, particularly? Why were you going to pick him up?
"A To help me on one of my houses.

"Q What were you doing on your houses?
"A Carl, I can't tell you exactly what we were doing cause I was remodeling three houses at one time and it is kind of hard to recall.

"Q These were rental houses, rental houses that you owned at the time?
"A Right.

"Q And you were doing something with respect to remodeling?
"A I had them moved in and I was remodeling, getting them ready to rent."

We must decide whether this evidence is sufficient to support an inference that Lovely was acting in the course of his employment for defendant at the

time of the accident. Stated differently, the question is whether the inference of agency arising from Lovely's possession of the truck owned by defendant was rebutted by evidence that tends to show that Lovely was using the truck for personal purposes.

■ We have held that to overcome the inference of agency arising from possession by one not the owner, the evidence must be clear and convincing.[3] And it should be noted that the inference of agency is strengthened in the present case by the fact that the vehicle is a truck driven by an employee of the owner.[4] On the other hand, it is also important to take into account Mr. Justice Lusk's observation in *Bunnell v. Parelius,* 166 Or 174, 185, 111 P2d 88 (1941), that "the inference of agency from the fact of ownership is a slender reed upon which to lean; a species of evidence so weak that in any intelligent system of law it must yield to facts established by evidence which only an arbitrary judgment would reject."

We are also to bear in mind that the inference may be rebutted by testimony that comes from an interested witness.[5] And, as we have previously noted, we must take into consideration the factors isolated in *Rickard v. Ellis, supra,* relating to the access of the parties to the evidence tending to support or contra-

[3] Brown v. Fields, 160 Or 23, 29, 83 P2d 144 (1938). The court held that the question of agency is to be submitted to the jury unless "the only reasonable deduction to be made from the evidence is that the automobile was not being driven in furtherance of the interests of the owner * * *."

[4] *Cf.,* Jasper v. Wells, 173 Or 114, 130, 144 P2d 505 (1943).

[5] Miller's Will (Luis v. Muhrback), 49 Or 452, 464, 90 P 1002, 124 Am St Rep 1051 (1907): "The testimony of witnesses is not to be disregarded merely because they are interested in the result. Other reasons for discrediting them must appear." See also, Miller v. Service and Sales, Inc., 149 11, 38 P2d 995, 96 ALR 628 (1934); 62 ALR2d 1198.

dict the inference of agency arising out of the fact of ownership.

Looking first at the alleged oral bailment under which Lovely was entitled to use the truck after working hours for his own personal purposes, we have the uncontradicted testimony of Lovely and also that of John Whittemore. If it is said that the jury could disbelieve Lovely because his interest in retaining his employment might tempt him to testify falsely, it can also be said that his testimony exculpating defendant served to identify Lovely as the person at fault. But even if Lovely's testimony is discredited because of his interest, there is still the testimony of John Whittemore, defendant's former manager, testimony which cannot be attacked upon the ground that it was self-serving, because at the time he testified he was not employed by defendant but was engaged in his own business. Because Whittemore was engaged in a business which competed with defendant's the temptation, if any, would be to testify unfavorably to defendant's interest. And if, in fact, there was no bailment to Lovely for personal use, plaintiff was not without means of disproving it.

In the face of this evidence, the members of the jury could not conclude that there was no bailment simply by deciding that they would not believe either Lovely or Whittemore. This would violate the principle explained in *Jerke v. Delmont State Bank, supra,* that the jury must reach its conclusions "by a process of rationalization and judgment, and by the application of the thinking faculties of the human mind to the evidence." (54 S D at 456.) This uncontradicted evidence of a bailment would, then, rebut the inference of agency from the fact of ownership in the absence

of additional evidence from which it could be inferred that the truck was actually being used at the time of the accident for the employer's business purposes rather than for Lovely's own personal purposes.

■ Plaintiff would have us hold that because Lovely was on call during the evenings to repair roofs for defendant, any use of the truck by Lovely would be in the course of his employment. We reject this characterization of the transaction. It is our view that during off hours Lovely would assume his status as an employee only when he was actually using the truck to carry out a specific job for his employer.

Plaintiff then argues that there was evidence to show that at the time of the accident Lovely was using the truck for defendant's purpose. She contends that the jury could find that Lovely's purpose in visiting Hansen on the evening of the accident was to check with Hansen on the progress of that day's work by the roofing crew. To support this possible interpretation of Lovely's visit, plaintiff relies upon the conversation between Lovely and Hansen at the latter's home just before the accident, pointing specifically to Lovely's inquiries: "Did you get done with your job" and "How did you fellows do today." It is argued that these inquiries could be regarded by the jury as evidence that Lovely went to Hansen's home to serve the interest of his employer by ascertaining what the roofing crew did during the day. Plaintiff's counsel attempted to strengthen the alleged inference by getting Lovely to admit that he sometimes checked with men on the roofing crew after hours as to the progress of their work.[9]

---

[9] "Q From time to time in your work for Van Petten Lum-

Considering the context in which Lovely's inquiries were made, it would be gross speculation for the jury to conclude that the objective of Lovely's visit was to carry on his work for defendant.

In appraising the uncontradicted testimony explaining Lovely's visit as having been prompted by a personal objective, it is important to note that at the time Hansen testified he was not employed by defendant. Quite to the contrary, he was carrying on his own roofing business presumably in competition with defendant's business. There was not therefore "the likelihood that the witness's interest in the litigation * * * [would] tempt him to testify falsely," which we isolated as an important factor in *Rickard v. Ellis, supra* 230 Or at 52.

Moreover, there was available to plaintiff the opportunity to contradict the witnesses' statement if it was false, another factor noted in *Rickard v. Ellis, supra.* Lovely and Hansen testified that Hansen had been previously employed by Lovely to work on the

---

ber Company, it was the custom for you to check with your men on your crew or crews, some evenings, to see how they were getting along wasn't it?

"A Not very often, Charlie. I generally had my work lined out in the morning. I consulted my crews in the morning because there were lots of times I would be out where I wouldn't see my crew when they come in of an evening.

"Q So you would have to check with them?
"A Not of a night.

"Q But you did, didn't you?
"[Objection] * * *

"Q You did sometimes contact the employees and check with them in the evening as to the progress of the job they were working on?

"A I have an idea—I don't ever remember running one of them down to find out what he done, but I have an idea I have asked some questions when they come in or something like that."

latter's houses. Payment for these services was by check. If, on demand, Lovely could not have produced the cancelled checks, there would then have been reason to disbelieve Lovely's explanation for visiting Hansen.

We have previously noted that Whittemore was also in a business in competition with the business of defendant and therefore had no reason to give false testimony in favor of defendant. It would not have been reasonable for the jury to disbelieve Whittemore's testimony as to the nature of the bailment of the truck.

■ We have, then, as we had in *Judson v. Bee Hive Auto Service Co., supra,* evidence of a bailment, uncontradicted by any evidence adduced by plaintiff. The jury could not have concluded on a rational basis that Lovely was in the course of his employment for defendant at the time of the accident.

The judgment is affirmed.

DENECKE, J., dissenting.

I dissent bcause I am of the opinion that the evidence does not, as a matter of law, rebut the presumption of agency.

TONGUE, J., dissenting.

I dissent because I am convinced that both the result reached by the majority and the reasoning adopted by it in reaching that result are contrary to the requirements of Article VII, § 3 of the Oregon Constitution and because the rules of law adopted by the majority seriously erode, if not undermine to the point of destruction, three long-established rules of fundamental importance:

1. The rule that in an automobile accident case

in which a car owned by the defendant was being driven by a third person, the plaintiff is entitled to the benefit of a possible inference by the jury that the driver of the other car was the owner's agent and was acting within the scope of his employment, for the purpose of making a prima facie case sufficient to go to the jury on that issue;

2. The rule that the credibility of a witness is ordinarily a question to be decided by the jury, rather than by the court;

3. The rule that on a motion for a directed verdict the court must assume the truth of all evidence favorable to the plaintiff and that such a motion must be denied unless the court can affirmatively say that there was no substantial evidence to support a jury verdict to the contrary.

Before discussing these matters it is necessary to focus upon the more particular issues to be decided on this appeal. According to the majority:

"* * * [t]he issue on appeal is whether there was any evidence other than the *uncontradicted testimony* of defendant's witnesses from which the jury could have reasonably inferred that Lovely was acting as defendant's servant at the time of the accident." (Emphasis added)

Throughout its opinion the majoriy refers to the "uncontradicted testimony" of defendant's witnesses. That, however, begs the most vital question to be decided in this case. As I see it, the questions to be decided are these:

1. Was the inference of agency from the fact that defendant's truck was being driven by defendant's employee "substantial evidence" for the pur-

poses of Article VII, § 3, under the facts of this case and, if not, was the inference overcome by "clear and uncontradicted evidence"?

2. Was the testimony of defendant's witnesses "clear and uncontradicted" to the extent that the credibility of such witnesses was not a question for the jury, but a question for decision by the court to the effect that the jury would have been bound by such testimony and had no right to disbelieve it?

3. Was there any "substantial evidence" from which the jury could find, either in corroboration of or independently from the inference of ownership, that defendant's truck was being used for the business of the defendant at the time of the accident?

1. *The prima facie inference of agency from the fact that a truck is being driven by an employee of its owner is not a "slender reed," but has been recognized by this court to be a "just and wholesome rule" based on sound public policy and constitutes "substantial evidence." In any event, that inference can only be overcome by "clear and uncontradicted evidence."*

The majority would characterize the prima facie inference of agency from the fact that defendant's truck was being driven by one of defendant's employees as "a slender reed upon which to lean" and a "weak species of evidence," quoting with approval from a concurring opinion in *Bunnell v. Parelius,* 166 Or 174, 185, 111 P2d 88 (1941), and adopting that view, for the first time, as the position of the majority of this court.

That view, however, was not adopted by the ma-

jority in *Bunnell,* nor by ROSSMAN, J., in his separate concurring opinion. Of more importance is the fact that in other decisions, both before and after *Bunnell,* this court has recognized that the prima facie inference of the agency of the driver of a motor vehicle from the fact of its ownership by the defendant is a "just and wholesome rule" and one based upon sound public policy.

Thus, in the case which has the genesis of this rule in Oregon, *Judson v. Bee Hive Auto Service Co.,* 136 Or 1, 294 P 588, 297 P 1050, 74 ALR 944 (1931), this court held (at 8-9):

"* * * when a person is found in possession of a car and is operating it, it is not an unreasonable deduction that he is the agent of the owner and is using the automobile for the latter's benefit. Experience teaches that when automobiles are involved in accidents they are ordinarily being operated by the owner or by someone for whose negligence he will be responsible.

"This doctrine of respondeat superior is just and wholesome. An automobile is potentially a dangerous instrument as evidenced by the appalling number of accidents in recent years. In these days of 'hit and run' drivers the party injured does well to prove the ownership of the automobile, aside from any question of establishing the fact that the driver was acting within the scope of his agency. Ordinarily plaintiff is not in a position to prove those things which are peculiarly within the knowledge of the owner. Most courts consider it just and reasonable to require that defendant go forward with the evidence and rebut the inference of agency by showing that, in truth and in fact, he is in no manner responsible for the acts of the driver. This does not mean that the burden of proof relative to the question of agency is to be shifted from the plaintiff to the defendant. The

burden of proof never shifts from the party who has the affirmative of an issue, but the burden of proceeding with the evidence sometimes does. The law, in effect, says to the owner: 'If you do nothing to explain your relationship to the driver of the automobile, the jury may infer that he was acting in your behalf.' "

As also later recognized in *Jasper v. Wells,* 173 Or 114, 123-24, 144 P2d 505 (1943), quoting with approval from *Bunch v. Standard Oil Co.,* 144 Or 1, 11-12, 23 P2d 328 (1933):

" 'In order to avoid the consummation of an injustice, and when the facts are peculiarly within the knowledge of the opposite party litigant, the courts have relaxed * * * the quantum of proof required of plaintiff to entitle him to have his case submitted to the jury, in the absence of any evidence on behalf of the defendant.' "

To the same effect, as stated in *Summerville v. Gillespie,* 181 Or 144, 149, 179 P2d 719 (1947), quoting with approval from *West v. Kern,* 88 Or 247, 254, 171 P 413, 1050 (1918):

" 'This rule proceeds on the theory that the facts are peculiarly within the knowledge of the defendant and that he can easily furnish the necessary evidence to show that the vehicle was not being used for him, if such is the fact. If it be said that this rule occasionally imposes a hardship upon a defendant, the answer is that a less liberal rule would more frequently result in hardship to a plaintiff.' "

This view is in accord with the decisions of the courts of most other states on this subject. See 11 Blashfield, Automobile Law and Practice (3d ed 1968) 174, § 417.7, citing numerous cases holding that proof of ownership of an automobile either creates a pre-

sumption or justifies an inference that the driver was the agent or servant of the owner and that at the time of the accident he was operating it within the scope of his agency or employment.

In Oregon, unlike most states, Article VII, § 3 of its Constitution expressly forbids all Oregon courts from "re-examining" any fact found by a jury by the granting of a judgment n.o.v. "unless the court can affirmatively say there is no evidence to support the verdict."[1] Conversely, the effect of the adoption in 1910 by the voters of Oregon of Article VII, § 3, is to forbid all courts from granting motions for involuntary nonsuits or directed verdicts if there is any substantial evidence from which the jury could return a verdict in favor of the plaintiff. See *Kraxberger v. Rogers,* 231 Or 440, 449, 373 P2d 647 (1962).

It will be noted that the rule of *Judson v. Bee Hive Auto Service Co., supra,* although referred to by this court as an "inference," has characteristics of both an "inference" and a "presumption," and that both "inferences" and "presumptions" are declared by Oregon statute to be "indirect evidence."[2] In addition, ORS 17.250 (2) expressly provides, with reference to juries, that:

"That they are not bound to find in conformity

---

[1] The term "no evidence" has been interpreted by this court to mean "no substantial evidence." Kraxberger v. Rogers, 231 Or 440, 449, 373 P2d 647 (1962).

[2] The Oregon legislature has declared (by ORS 41.040) that evidence includes both "direct" and "indirect" evidence and has declared (by ORS 41.310) that "indirect evidence" is of two kinds: "inferences" and "presumptions." An "inference" is defined (by ORS 41.320) as "a deduction which the reason of the jury makes from the facts proved, without an express direction of law to that effect." A "presumption" is defined (by ORS 41.340) as "a deduction which the law expressly directs to be made from particular facts." See also McCormick on Evidence (2d ed 1972) 806-807, § 343.

with the declarations of any number of witnesses, which do not produce conviction in their minds, against a less number, or against a presumption or other evidence satisfying their minds;"

Insofar as proof of ownership supports a logical deduction of the fact of agency, it is an inference, but insofar as it is a rule based not only upon the idea of "probability," but also on the public policy arising from problems of proof confronting persons injured in automobile accidents, it partakes of at least some of the characteristics of a presumption.[3]

Because of the constitutional requirements of Article VII, § 3, as well as the statutory provisions of ORS 41.310, 41.320, 41.340 and 17.250(2), and because we have held that under this rule proof of ownership alone is sufficient to make a prima facie case on the issue of agency,[4] it is difficult to escape the conclusion that the "inference" or "presumption" arising from the rule of *Judson v. Bee Hive Auto Service Co.*, supra, constitutes "substantial evidence" so as to forbid all Oregon courts from granting an involuntary nonsuit or a directed verdict in such a case on the issue of agency, as was done by the trial court in this case.

Nevertheless, this court held in that case, that the inference arising from the fact of the ownership of an automobile, although "evidence" by statute, was "no evidence" within the meaning of Article VII, § 3 of the Oregon Constitution.[5] It is important, however, to note two basic elements that were present in that

[3] The rule is regarded as a presumption in McCormick on Evidence (2d ed 1972) 808, § 343.

[4] Judson v. Bee Hive Auto Service Co., 136 Or 1, 6, 294 P 588, 297 P 1050, 74 ALR 944 (1931).

[5] *Id.* at 14-15, quoting with approval from Consor v. Andrew, 61 Or 483, 490, 123 P 46 (1912).

case: (1) the evidence which was held to overcome that inference consisted of a written bailment agreement which was not only uncontradicted, but was of unquestioned authenticity and credibility, so as to justify the court in stating (at 14) "[t]here is not the slightest suspicion about it," and (2) in that case the inference of agency rested on proof of ownership alone, with no other supporting evidence whatever, either direct or indirect.⑨

The illustration used by the court (at 14) to support its conclusion is also revealing, i.e., that the presumption that a person not heard from for seven years is dead would surely be overcome if that person walked into the court room, leaving nothing for the jury to decide on that issue.

The majority in this case concedes that in order

---

⑨ It is also of interest to note that in Judson v. Bee Hive Auto Service Co., *supra* note 4, no reference was made to the previous decision of this court in Richardson v. Portland T. Car Co., 113 Or 544, 549, 233 P 540 (1925), in which this court disposed of defendant's reliance on Goss v. Northern Pacific Railway Co., 48 Or 439, 87 P 149 (1906), as follows:

"* * * Chief Justice Bean, speaking for the court, concluded by saying:

" '* * * where there is no proof of negligence, except the mere inference or presumption arising from an accident, and this is overcome by positive, undisputed and unimpeachable testimony, there is no question of the preponderance of evidence, and nothing for the jury to decide.'

"The rule announced by the learned Chief Justice was undoubtedly a correct statement of the law when made; but, in view of Section 3, Article VII, of the Constitution of Oregon, which now precludes this court from considering the weight of evidence when passed on by a jury, it can no longer be regarded as such. It is not for us to say as a matter of law that a presumption of negligence has been overcome by evidence, as that is a matter within the exclusive province of the jury to determine. * * *"

This holding in *Richardson* has never been expressly overruled on this point. To the same effect, see Gillilan v. Portland Crematorium Assn., 120 Or 286, 293, 249 P 627 (1926).

to overcome the prima facie inference of agency arising from the fact of ownership the evidence must be "clear and uncontradicted." As also stated in *Gossett v. Van Egmond,* 176 Or 134, 143-144, 155 P2d 304 (1945):

> "\* \* \* [A]s a general rule it is for the jury to say whether or not a prima facie case, based upon inference, has been overcome. Only in the extreme instances, when but one reasonable inference can be drawn from the facts, should the court direct a verdict."

It would appear, however, from a decision by Justice LUSK, speaking for this court in *Kraxberger v. Rogers, supra* (at 450) (some years after his concurring opinion in *Bunnell v. Parelius, supra,* relied upon by the majority), that in order to overcome the inference arising from the ownership of an automobile the evidence must not only be "uncontradicted," but must be "free from doubt or suspicion" as to the credibility of the "uncontradicted" testimony.

Indeed, the mandatory provisions of Article VII, § 3, would appear to require that the question whether the prima facie inference of agency arising from the ownership of an automobile has been overcome must be submitted to the jury as a question of fact, and cannot be decided by the Oregon courts as a matter of law, either: (1) if the credibility of the witnesses who give the testimony claimed to overcome that inference was not "free from doubt or suspicion" or (2) if, in addition to the inference of agency arising from the fact of ownership alone, there was any other evidence to support that inference.

Thus, we must next consider the remaining two questions:

(1) Can it be truthfully said that the testimony

of Hansen and Lovely as to the intended purpose of Lovely's visit to Hansen was not only "uncontradicted" as claimed by the majority, but that the credibility of these witnesses was "free from doubt or suspicion," and (2) can it be truthfully said that there was no other or additional evidence which either supported the inference that the purpose of the visit was within the scope of Lovely's employment by defendant or which tended to contradict the testimony claimed by the majority to be "uncontradicted."

In my opinion, if there is any reasonable doubt as to the answer to either of these questions, the refusal to submit this case to the jury would not only violate the constitutional mandate of Article VII, § 3, but would "make a mockery" of a rule which we have held to constitute a prima facie inference of agency in automobile accident cases and to be a "just and wholesome rule" in such cases by "taking away with one hand what [the court] has with enlightened liberality given with the other."[7]

2. *The credibility of the testimony of Lovely and Hansen that it was their intent to use the truck to go to work on one of Lovely's rental houses was not "free from doubt or suspicion," so as to make it proper to withdraw that question from the jury.*

As stated by the majority, this court in *Rickard v. Ellis*, 230 Or 46, 51, 368 P2d 396 (1962), and in *Wiebe v. Seely, Administrator*, 215 Or 331, 343-44, 335 P2d 379 (1959), examined "the well-established principle that the credibility of witnesses is ordinarily to be determined by the jury." As also stated by the

---

[7] Cf. Bobbe, The Uncontradicted Testimony of an Interested Witness, 20 Cornell L Q 33, 49 (1934).

majority, this court in *Rickard* (at 52) stated that "two important factors" to be considered in deciding whether to withdraw from the jury the credibility of witnesses who give "uncontradicted testimony" are: "(1) the availability of evidence to contradict the witness's statement, and (2) the likelihood that the witness's interest in the litigation may tempt him to testify falsely."

In neither *Rickard* nor in *Wiebe* did this court discuss this problem in terms of Article VII, § 3. The reason may be that in both cases it was held that the credibility of the testimony of the witnesses involved should have been submitted to the jury. Thus, this court did not withdraw that question from the jury in those cases.

The majority, however, would now apply the "tests" as stated in *Rickard* and *Wiebe* to justify the withdrawal from the jury of the question of the credibility of testimony given by Lovely and Hansen that it was their intent to use the truck to go to work on one of Lovely's rental houses. Thus, the problem is presented as to whether, and if so, under what circumstances, this can be done within the limits of the mandatory provisions of Article VII, § 3.

As previously stated, Article VII, § 3, not only guarantees the right of trial by jury, but expressly forbids the Oregon courts to withhold from the jury any issue of fact on which there is substantial evidence, whether direct or indirect, and including all reasonable inference. It would thus appear to be difficult to reconcile with Article VII, § 3, the withdrawal from the jury of any issue relating to the credibility of a witness unless both the substance of his testimony and the credibility of the witness are clear and

uncontradicted. Conversely, if there is any substantial evidence, whether direct or indirect, which either contradicts the substance of the testimony or impeaches the credibility of the witness who gave such testimony, the Oregon courts, by reason of Article VII, § 3, must leave the credibility of such a witness to the jury.

The question whether the testimony of Lovely and Hansen was "uncontradicted," as held by the majority, is discussed separately below. We now turn, however, to the question whether there was any evidence, direct or indirect (i.e., including inferences), which impeached the credibility of Lovely and Hansen.

In addition, as previously stated (and wholly aside from Article VII, § 3), two factors recognized by the majority as factors to be considered in deciding whether the credibility of witnesses should be submitted to the jury, even if their testimony was uncontradicted, are: (1) whether the testimony comes from an interested or a disinterested witness and (2) whether evidence is available to contradict the witness's statements.

The majority quotes at length from the testimony of Lovely and Hansen, including their testimony that Lovely's purpose and intent in using the truck that evening was to pick up Hansen to help him in working on one of his rental houses. The majority then says that these two "factors" were satisfied in this case because Hansen was not an interested witness for the reason that he was no longer employed by defendant at the time of trial, but was a "competitor," and because evidence was available to contradict that testimony in that payment by Lovely to Hansen for previous similar work had been made by checks, which could have been produced on demand.

It must be conceded that at the time of trial Hansen had no further interest as an employee of defendant and that he did not have an interest as strong as that of the witness in *Rickard v. Ellis, supra.* On the other hand, the issue to be decided in this case was not the intent of Hansen, but the intended purpose of Lovely in using the truck that evening. Lovely was clearly an interested witness. Even as to Hansen, however, it is apparent from the testimony that he not only had been recently employed by defendant, but was a friend of Lovely. While his interest in protecting both defendant and Lovely was perhaps not direct, Hansen was not a completely disinterested witness in the same category as an innocent bystander or a complete stranger. Conversely, the jury could properly find from these circumstances that he had at least some substantial bias in favor of Lovely and defendant, as Lovely's employer.

And while checks might have been produced to show *prior* employment of Hansen by Lovely, the question is not whether Hansen had previously worked on Lovely's rental houses, but what they intended to do that night. This was a question of Lovely's subjective intent and was thus a question on which there could have been no evidence to contradict, much less any objective evidence.

Thus, in *Rickard v. Ellis, supra,* we held (at 54), in referring to testimony relating to matters which were wholly subjective:

> "We believe that this is precisely the type of situation in which the jury's function in testing the credibility of witnesses has its greatest justification, i.e., where an essential fact in issue is ascertainable only through the testimony of a claimant. * * *"

To the same effect, this court held in *Leo v. Heller,* 255 Or 390, 393, 467 P2d 439 (1970), in rejecting a contention that a trial judge, as the trier of the facts in that case, erred in disregarding the testimony of defendant's witnesses:

> "\* \* \* [m]uch of the testimony offered by defendant was of the kind that plaintiff would not likely be able to secure knowledge or evidence of its truth or falsity. Thus, plaintiff would not be in a position to contradict it. Under such circumstances, the finder of facts is not required to accept the testimony at face value. \* \* \*"[8]

Indeed, it is the generally recognized rule that a person's intent is a question of fact to be decided by the jury. *Parker v. School District of Valley Park,* 325 SW2d 59, 61 (Mo Ct App 1959), and *Piwowarski v. Cornwell,* 273 NY 226, 7 NE2d 111-12 (1937). This is because intent is a "subjective thing" and "[w]hat a man says about it may as easily conceal it as reveal it." *State v. Mueller,* 388 SW2d 53, 60 (Mo Ct App 1965). And a "given intent may be found even though a party orally deny its existence." *State Highway Dep't. v. Civil Service Commission,* 35 NJ 320, 173 A2d 28, 32 (1961). See also *Hasty v. Wilson,* 223 Ga 739, 158 SE2d 915, 923 (1967); *Hankinson v. Lynn Gas & Electric Co.,* 175 Mass 271, 56 NE 604, 605 (1900); and 72 ALR 27, 54-55 (1931).

In addition, it is also to be noted that in *Rickard v. Ellis, supra* (at 52), it was made clear that the interest of a witness and the availability of evidence to contradict his testimony are only two "factors" to be

[8] For a more recent case in which this court held that the trier of the fact was not required to believe uncontradicted testimony, upon application of the rule of Rickard v. Ellis, 230 Or 46, 52, 368 P2d 396 (1962), see Bezoff v. Crater Lake Motors, Inc., 259 Or 449, 452, 486 P2d 1274 (1971).

considered in deciding whether the credibility of the witness must be submitted to the jury. Because in *Rickard* we held that the credibility of the witness in that case should have been submitted to the jury it was not necessary to consider other possible "factors" which would also require the same result, although express reference was made (at 52, n. 2) to "other factors."

These additional "factors" include the existence of *inconsistencies* in the testimony of the witness who gave the "uncontradicted" testimony which might serve to impeach the credibility of the witness and the fact that the *demeanor* of the witness may be such as to cause the jury to discredit his testimony.[9]

As stated by Justice Lusk in *Kraxberger v. Rogers, supra* (at 453), an automobile case involving the issue whether the driver was driving with the permission of the owner:

"* * * since the jury had the right to believe that the defendant had taken inconsistent positions with respect to a material and important part of his testimony they would have been justified in entertaining 'different views' as to the whole of it."

See also *Davis v. Underdahl,* 140 Or 242, 248, 13 P2d 362 (1932), in which Chief Justice BEAN quoted with approval from another case as follows:

"'* * * [a] witness' manner of testifying may give rise to doubts as to his sincerity, or create the

---

[9] See Brizius, Directed Verdicts on Uncontradicted Testimony, 1959 Trial Lawyers Guide 65, 73; Note, The Power of the Court to Determine Witness Credibility, 107 U Pa L Rev 217, 227 (1958). See also Annot., 62 ALR2d 1191, 1194, 1209 (1958); Note, The Motion for Directed Verdict in Indiana, 32 Ind L J 238, 254 (1957); and Bobbe, The Uncontradicted Testimony of an Interested Witness, *supra* note 7.

.impression that the facts testified to by him are colored or not correctly stated.' "

In addition, ORS 17.250(3) provides, with reference to the consideration by a jury of the credibility of a witness:

"That a witness false in one part of his testimony is to be distrusted in others;"

Thus, it is specifically provided by statute in Oregon that an inconsistency in the testimony of a witness is a proper factor to be considered in determining the credibility of his testimony.

The majority has quoted from the testimony of both Hansen and Lovely. It appears from the quoted testimony that when plaintiff's attorney interviewed Hansen prior to the trial he was told by Hansen that when Lovely came to his door on the evening of the accident he inquired about the roofing job on which Hansen had worked that day as an employee of defendant under the supervision of Lovely, as his foreman, and that Lovely had been on that job in the morning, but not that afternoon. The fact of the inquiry by Lovely about that job upon calling at Hansen's home was, of course, important evidence to the plaintiff to show that Lovely was acting in the course of his employment when he used defendant's truck to call on Hansen.

When, however, Hansen was called by plaintiff's attorney as a witness he flatly denied that Lovely made such an inquiry. Only when plaintiff's attorney reminded Hansen of the statement previously made by him did Hansen admit that he had made such a statement and he then hastily volunteered that "that was all."

Lovely, when asked by plaintiff's attorney whether he had made such an inquiry on calling at Hansen's home, answered "Not that I recall."

Under these circumstances the demeanor of both Hansen and Lovely as they testified and as they appeared together in the courtroom could have been an important factor to the jury in deciding whether or not they were truthful and credible witnesses[20] or whether, on the contrary, they were hostile, uncooperative and evasive witnesses who lied on vital matters when they could get away with it and attempted to conceal the true facts.

In addition, and of even more importance for the purposes of Article VII, § 3, the jury could very properly have found from this inconsistency in the testimony by Hansen that he fully realized the importance of that inquiry; that Hansen lied deliberately in at first denying that inquiry; that when caught in the lie he attempted to help his friend Lovely as best he could by a voluntary attempt to minimize the extent of the conversation on that subject, and that Lovely also lied about the matter in choosing not to "recall."

For all of these reasons, I strongly believe that the jury in this case was not required to believe the testimony of Lovely and Hansen that their subjective purpose and intent on the night of the accident was to work on one of Lovely's rental houses.

It is quite one thing to say that the jury must believe uncontradicted testimony by a completely disinterested witness as to an objective fact which is

---

[20] Lovely also gave inconsistent testimony in that on cross-examination he directly denied that he examined the bumper of the truck immediately after the accident, while on redirect examination he admitted that he did so.

capable of complete verification. It is quite another thing, particularly in view of the mandate of Article VII, § 3, to say that a jury is compelled to believe the testimony of a witness who has any possible bias or interest, by reason of friendship, employment or otherwise, when the subject of his testimony relates to his own or another person's subjective purpose or intent. This is particularly true when, as in this case, there was evidence from which the jury could have found that a witness was not only biased, but that there were inconsistencies in his testimony, providing further "substantial evidence" from which the jury could have found that the witness was untruthful.

In my view, the testimony of both Lovely and Hansen falls within this category and it was for the jury alone to decide whether or not they were telling the truth, after observing their demeanor, which this court cannot do. I cannot subscribe to the proposition that under the circumstances of this case it was proper to hold, as a matter of law, that the jury was required to believe the testimony of these witnesses and to deprive the plaintiff of what I consider to be her right under the Oregon Constitution to have the question of their credibility submitted to the jury.[9]

Of even greater importance, however, is the fact that the jury was not required to accept the testimony of Lovely and Hansen because, in my opinion, even if their testimony was otherwise "credible," that testi-

---

[9] Cf. Gossett v. Van Egmond, 176 Or 134, 144, 155 P2d 304 (1945), in which this court stated, with reference to the closely related "family purpose" doctrine:

"* * * [t]he 'family purpose' doctrine has been adopted in this state as a part of the law of agency. If the testimony of interested witnesses, under the circumstances before us, 'were to be received as conclusive, the "family purpose" doctrine would be practically nullifed.' * * *"

mony cannot properly be said to be "uncontradicted" evidence, as so repeatedly stated by the majority. This is of extreme importance because if there was any "substantial evidence," aside from or in addition to the inference of agency arising from the fact of ownership, from which the jury could find that the purpose of Lovely in calling on Hansen was to inquire as to the progress of the work of defendant's roofing crew on the morning of that day, two results would then follow: (1) the testimony that the purpose of the trip was to pick up Hansen to work on Lovely's rental house would not be "uncontradicted," as required in order for this court to hold, as a matter of law, that such testimony overcame the prima facie inference resulting from the fact of defendant's ownership of the truck, and (2) the possible finding of the jury for the plaintiff on that issue would not then be dependent solely upon the inference of agency from the fact of ownership, because that same finding would then also be supported by other evidence so as to make it even more clearly mandatory under Article VII, § 3, that the case be submitted to the jury for decision.

3. *There was "substantial evidence" which, when considered either in conjunction with or independently from the prima facie inference arising from the fact of ownership of the truck would have supported a finding by the jury that the purpose of the use of the truck was within the scope of Lovely's employment.*

   a. *The test to be applied in determining this question is not whether a judge may think that such a finding by the jury would be "unreasonable," but whether there was any "substantial evidence" to support such a finding.*

Before discussing the testimony it is first necessary to consider the legal standard which the majority would apply to a determination of this question.

The majority would adopt as the "general standard" to be applied in such cases the test as stated in *Jerke v. Delmont State Bank,* 54 SD 446, 456, 223 NW 585, 589 (1929), by quoting from that case as follows:

> "The court, after noting that *'we are too often prone to exaggerate the powers and privileges of a jury* as a trier of facts,' reminds us that *'the general superintendence* and control of the court and all its machinery, including the jury, *rests with the judge,* and [that] it is fundamental that' an issue arising between litigants must be tried by a general, rational, or reasoning process, *both as to the ascertaining of facts and the application of the law.'* " (Emphasis added)

and that:

> "'Jurors do not determine all questions of ultimate fact, even in jury cases. They determine the existence or nonexistence of those facts, and, *those only, with reference to the existence of which the judgment of reasonable men might differ* as a result of their intellectual faculties to the evidence.'" (Emphasis added)

The majority does not, however, quote the necessary corollary to such a rule, as set forth in the following additional statement by the South Dakota court in *Jerke* (at 591):

> "* * * [t]he standard of reasonableness is subjective, and it *is the standard of the judge* that must be used; probably in the final analysis the standard of the court of last resort in any given jurisdiction; but the nature of determination remains the same. When a court holds in any given case or upon any given facts, that the direction of

a verdict is proper, it is not in any strict sense announcing a rule or doctrine of law, but is merely *announcing its judgment* or opinion as a matter of reason and logic *that in that case* and upon those facts *reasonable minds could not differ* as to the result to be reached." (Emphasis added).

In other words, according to the majority, whenever the jury arrives at a verdict which, in the opinion of the trial judge would not be a reasonable result, the judge can set aside such a verdict by the simple process of saying that, in the exercise of his "intellectual faculties," no reasonable man could arrive at such a result and that anyone who contends to the contrary is, ipso facto, not a "reasonable man."

Conversely, whenever the trial judge, in the exercise of his "intellectual faculties," and by application of what is referred to in *Jerke* (at 594) as "the rule of reasonable judgment" believes that a verdict for one party or the other, whether plaintiff or defendant, would be "unreasonable" it has the duty to direct that a verdict be entered for the other party, whether defendant or plaintiff. (See *Jerke,* at 593.)[e]

It also necessarily follows that what is "reasonable" to one trial judge in one county may not be "reasonable" to another judge in the same or in another county and that what is now considered to be "reasonable" by the majority of the members of

---

[e] It is of interest to note that while in this case the majority would affirm a directed verdict for the defendant, rather than for the plaintiff, the effect of this decision is to affirm a directed verdict on the issue of agency in favor of the party with the burden of going forward with the evidence on that issue, which had passed to the defendant upon proof by plaintiff that the truck was owned by defendant. See also Comment, Directing the Verdict in Favor of the Party with the Burden of Proof, 50 NC L Rev 843, 846 (1972).

this court may not be considered "reasonable" by a majority of the members of the court in another year.[⑳]

It may be that in South Dakota and in some other common law jurisdictions the courts have such broad powers in jury cases. In Oregon, however, in 1910, after a long history of dissatisfaction with the setting aside of jury verdicts by the courts and with the expense and delay of the appeals encouraged by the exercise of such broad powers, the voters adopted as an amendment to the Constitution of Oregon Article VII, § 3, which provides, among other things that:

> "* * * no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict * * *."

As previously stated, this mandate is controlling not only upon the power of the Oregon courts to set aside jury verdicts, but also upon their power to grant directed verdicts and thereby refuse to submit cases to the jury for decision. Yet the "rule of reasonable judgment," as adopted by the majority, would restore to trial judges and to this court the very power of the common law courts that the people of Oregon sought to limit, if not take away, by the adoption of Article VII, § 3, by authorizing Oregon trial judges (and this court) to by-pass the requirements of Article VII, § 3,

---

[⑳] By analogy, in 1961 it was held by one appellate court that a jury award of $50,000 for loss of two fingers on one hand to a 31-year-old railroad employee was so "grossly excessive" as to necessitate a new trial, i.e., all "reasonable minds" would so agree, see Smith v. Illinois Central Railroad Co., 29 Ill App 2d 168, 172 NE2d 803 (1961). Yet another court held in 1960 that a jury award of $78,860 for loss of two fingers and part of a third finger to a 37-year-old railroad employee was not excessive. See Missouri Pacific Railroad Company v. Handley, 341 SW2d 203 (Tex Civ App 1960). For other examples, see Annots., 12 ALR3d 117, 475; 11 ALR3d 9, 370; and 17 ALR2d 832.

by the granting of directed verdicts whenever; in the opinion of the court, a jury verdict other than as so directed would be "unreasonable."

In my opinion, this case should be decided solely by considering whether, as required by Article VII, § 3, a jury verdict in favor of the plaintiff in this case would have to be set aside upon the ground that there was no "substantial evidence" to support a finding by the jury that on the evening of the accident Lovely was using the truck within the scope of his agency or employment as an employee of the defendant.

It may be contended, whether cynically or not, that even under the rule of "substantial evidence" courts may reach the same result and that the problem is mainly one of semantics. I prefer to believe, however, that the Oregon voters, by the adoption of Article VII, § 3, had a right to expect that under the terms of that provision jury verdicts would have more finality and that judges would have less power to direct or set aside jury verdicts than in previous years during which the Oregon courts followed a rule which had substantially the effect as the rule that the majority would now adopt.[9] I believe that the people of Oregon are entitled to have the provisions of Article VII, § 3, interpreted and applied in such a manner as

---

[9] It is not unlikely that in 1910 the voters of Oregon, in the adoption of Article VII, § 3, as an amendment to the Oregon Constitution, were of the same mind as that expressed in Travelers' Ins. Co. v. Selden, 78 F 285, 287 (4th Cir 1897), that:

"the judgment of 12 impartial men, of the average of the community, applying their separate experiences of life to the solution of such doubts as may arise, is more likely to be wise and safe than the conclusion of any single judge, and the practice is not to be encouraged which would substitute the conclusion of one mind for that average judgment which is the object of our system of jurisprudence to obtain in all proper cases * * *."

will carry out that original intent and that the doctrinaire theory adopted by the majority in this case would defeat, rather than carry out, that intent.

I must confess that I am unable to understand how the opinion to which the majority subscribes can properly ignore the existence of the problems in this case under Article VII, § 3, in this dissenting opinion. Indeed, if there are answers to these problems I believe that they should be discussed by the majority opinion, rather than wholly ignored by proceeding to decide this case as though Article VII, § 3, never existed.

b. *There was substantial evidence to support such a finding by the jury in this case.*

Upon examination of the entire record, the following facts appear, in addition to the so-called "uncontradicted testimony" of Hansen and Lovely:

(1) The vehicle which injured plaintiff was not an ordinary passenger car, but was a commercial vehicle—a pickup truck.

(2) Mr Lovely, the driver of the truck, was not only an employee of defendant, but was the foreman of defendant's roofing crew.

(3) Mr. Lovely was subject to "call" by defendant during the evenings, including the evening of the accident, in the sense that in the event of emergency calls he would answer such calls and make temporary roof repairs, as well as cost estimates for permanent repairs.

(4) The truck was owned by defendant and was placed by defendant in the possession of Mr. Lovely for use in answering such calls and also because he had a shop large enough for storage of the truck.

384

(5) All gasoline for the truck was furnished by defendant and the truck also carried at least some tools, equipment and supplies belonging to defendant.

(6) According to defendant's manager, Mr. Lovely, as foreman of defendant's roofing crew, "would supervise the crew when they were on the job *and* at the end of the day." As foreman, Lovely was interested in the progress of the various roofing jobs.

(7) In addition, when even the reluctant Mr. Lovely was asked if he checked with the roofing crew in the evenings to see how they were doing he answered *"not very often"* and that he *"generally"* had the work for the crew *"lined out in the morning."*

(8) On the day of the accident Mr. Lovely was present at the job being worked on by the roofing crew during the morning, but *not in the afternoon.*

(9) That evening Mr. Lovely drove the truck to the house of Mr. Hansen, a member of the roofing crew, parked the truck in front of his house, went to the door, "came in" and asked, "Did you fellows get done with your job? * * * How did you fellows do today?" according to the testimony of Mr. Hansen. Mr. Lovely did not "recall" this.

(10) At that point the conversation was interrupted by the accident.

The fact that the vehicle involved was a commercial vehicle; the fact that Lovely was an employee and the fact that the truck was carrying tools belonging to defendant are facts which constituted "substantial evidence" supporting the inference of agency and make that inference stronger than one based solely upon proof of ownership of a noncommercial vehicle, even though that is held to be sufficient to make a prima facie case on the issue of agency. See *Davis v. Underdahl,* 140 Or 242, 247, 13 P2d 362 (1932); *Jasper*

*v. Wells,* 173 Or 114, 130, 144 P2d 505 (1943) (concurring opinion); and *Kraxberger v. Rogers,* 231 Or 440, 451, 373 P2d 647 (1962).

Of more importance, however, is the fact that the requirement of "substantial evidence" on this issue of this case was amply satisfied by the testimony that Lovely usually checked with the roofing crew at the end of the day's work, but sometimes did so in the evening, coupled with testimony that he was not present that afternoon on the job being worked on by the roofing crew under his supervision and that on meeting Mr. Hansen he inquired as to the progress of the crew on the job that day. That testimony was sufficient to support several inferences by the jury:

(1) At least one of the inferences which the jury could have reasonably drawn from that testimony was that the purpose of the visit was in fact to inquire as to the progress of that job, just as stated in the words of the inquiry, and that this inquiry by Lovely was a "business inquiry" and not a mere "pleasantry," as the majority would necessarily assume. Even under the rule of the *Jerke* case, as adopted by the majority, I contend that this court cannot properly say that based upon this evidence no reasonable jury could have reached such a conclusion and that to do so would have been "gross speculation," as held by the majority. Indeed, such a finding by the jury from all of the facts of this case would have been far less speculative than the "inferences on inferences" which were held not to be speculative in *Eitel v. Times, Inc.,* 221 Or 585, 352 P2d 485 (1960).

(2) Another inference that the jury could reasonably have drawn from all of this testimony was that Lovely and Hansen were simply not telling the truth in the testimony of their wholly subjective

intent to work on one of Lovely's rental houses that evening.

(3) Still another inference the jury could have reasonably drawn from these facts was that even if such testimony was true, Lovely nevertheless had a dual purpose in making this trip; one purpose being to check on the progress made by the roofing crew that day, and the other purpose being to pick up Hansen to assist Lovely in working on his house. Even if the jury believed that the trip was taken primarily for that personal purpose of Lovely, such a conclusion would not preclude the trip from being within the scope of Lovely's employment by defendant so long as the jury further believed that Lovely would have visited Hansen to check on the progress of the job on which he had been absent in the afternoon even if he had not also intended to go on from there and work on his rental house. See 1 Restatement 523-24, Agency 2d § 236, Comment *b*, and 6 Blashfield, Automobile Law and Practice (3d ed 1966) 218-19, § 253.52.

We must not forget that in this case, as in many automobile accident cases, the injured plaintiff has the burden of proving the fact of agency from the mouths of defendant's own employees and their friends and that in such a case, upon the proof that the truck was owned by defendant the plaintiff made a prima facie case on the issue of agency and was then entitled to have that issue submitted to the jury, even in the absence of any other supporting evidence, unless that inference was overcome by evidence so "clear and uncontradicted" as to be "free from doubt or suspicion."[15]

---

[15] Kraxberger v. Rogers, *supra* note 1, at 450. Cf. Judson v. Bee Hive Auto Service Co., *supra* note 4, at 14.

In this case, for reasons previously stated, the evidence did not satisfy that test because: (1) it consisted of testimony by witnesses whose credibility was not "free from doubt or suspicion" and (2) that testimony was not "uncontradicted."

Thus, this court cannot properly withdraw from the jury the question of the credibility of Hansen and Lovely, not only because that testimony related to their subjective intent, rather than to any objective fact capable of verification, but also because there were inconsistencies in their testimony constituting "substantial evidence" from which the jury could properly find that they were biased and unreliable witnesses.

Neither can this court properly say that the testimony of Hansen and Lovely was "uncontradicted" because, in addition to the inference arising from the fact of ownership of the car, there was other affirmative testimony which not only cast doubt upon the veracity of that testimony, but provided additional and "substantial evidence" on the issue of agency in this case.

For all of these reasons, it is my considered opinion that it was error for the trial judge to refuse to submit these issues to the jury for determination. For these same reasons, I must respectfully dissent.