Argued October 15; affirmed November 19, 1929

## BANK OF CALIFORNIA NATIONAL ASS'N *v.* PORTLAND HIDE & WOOL CO.

(282 Pac. 99)

For appellant there was a brief over the names of *Mr. T. A. Weinke* and *Messrs. Angell, Fisher & Sabin* with an oral argument by *Mr. Homer D. Angell.*

For respondent there was a brief and oral argument by *Mr. Thomas G. Greene.*

BEAN, J. Testimony was offered by the defendant showing that at the time of the trial plaintiff held $24,000 in cash from the collateral and the defendant endeavored to produce additional evidence to show payment. The court, however, struck out the evidence showing cash held by the respondent and refused to permit evidence showing payment and instructed the jury to disregard such evidence.

It appears that at the opening of business, November 30, 1926, the Bank of Kenton owed the plaintiff bank an overdraft in the collateral account from the preceding day of $4,574.97. The total deposits by the Bank of Kenton with plaintiff during the day were $140,446.18, including the item of $8,767.08. The draft was deposited to the credit of the Bank of Kenton as cash, subject to check. Plaintiff charged the account of the Bank of Kenton with the amount of the overdraft carried at the close of business November 29. In addition to this there were on November 30 presented and paid by plaintiff and charged to the account of the Bank of Kenton checks and drafts drawn upon plaintiff by the Bank of Kenton to the amount of $144,987.61, leaving an overdraft of $9,116.40 at the close of business November 30, 1926.

When the suspension of the Bank of Kenton became known on December 3, 1926, and before the draft in suit had been presented to Charles J. Webb Sons company for payment, defendant telegraphed the drawee countermanding payment. Thereafter the draft was presented to the drawee who refused payment and the same was protested.

■ The first error assigned is that the court erred in striking from the record the testimony offered by defendant tending to show that the plaintiff had on hand at the time of the trial, in cash, the sum of $24,837.49, which had been collected from collateral held by it received from the Bank of Kenton and instructing the jury to disregard the testimony.

This testimony was presented upon the issue that the title of the Bank of Kenton to the draft in question was void and therefore the plaintiff, if holding the

draft as collateral, was a holder for value to the extent of its loan only, and any payment should have been applied: § 7819, Or. L.

Before this testimony produced could be material, in addition to the want of title or defective title of the Bank of Kenton to the draft in suit, it was requisite for the defendant to show, or that it should appear from the record, that the plaintiff held the draft as collateral. The testimony of Mr. Ray Landon, a witness for defendant, and deputy superintendent of the bank examiner in charge of the Bank of Kenton and who had the details of the liquidation of the bank in hand, was directly that the draft in suit was not affected in any way by the collateral account, from which it afterward realized $24,837.49, that the collateral had nothing to do with this draft. In other words, the testimony tended to show that the draft in question was not taken by the plaintiff, Bank of California, as collateral, hence the testimony referred to was immaterial and was properly stricken. The court instructed the jury that—

"If plaintiff has such security *or cash*, it will be required to account for the same to the superintendent of banks of Oregon, as successor to the Bank of Kenton's rights therein, for distribution to depositors and creditors of the Bank of Kenton. If defendant has a right to such collateral, it is only as a creditor or depositor of the Bank of Kenton and those rights, if any, can not be asserted in this action and constitute no defense thereto."

■ The Bank of California became the owner of the defendant's draft for $8,767.08, when the Bank of Kenton unrestrictedly indorsed the same for deposit, and it was credited to the Bank of Kenton by the plaintiff as cash, subject to check: *Bank of California v.*

*Young,* 123 Or. 95, 100 (260 P. 227) ; *Douglas v. Federal Reserve Bank,* 271 U. S. 489, 492 (70 L. Ed. 1051) ; *U. S. N. Bank of Portland v. Amalg. Sug. Co.,* 179 Fed. 718 (Aff'd. 187 Fed 746, 109 C. C. A. 494).

■ The Bank of Kenton was an indorser of the draft in suit drawn by the defendant Portland Hide and Wool company. The Bank of California was under no obligation to apply the deposit of an indorser of the paper to its payment. The duty of a bank to appropriate a deposit to the payment of a note has not been extended by any case beyond the deposit of the maker: 3 R. C. L. § 225, p. 597; *Landers Co. v. Lincoln-Alliance Bank,* 298 Fed. 79 (37 A. L. R. 576 and note p. 578). We quote from page 577 and 578 of the latter report:

"Again, in the case of *Thomas v. Mattiessen,* 232 U. S. 221, at page 236 (58 L. Ed. 577, 584, 34 Sup. Ct. Rep. 314), Mr. Justice HOLMES, in delivering the opinion of the court, says: 'The defendant was a principal debtor. * * * The fact that the corporation had deposits in the banks that held the notes did not discharge the notes pro tanto.' The Supreme Court of the United States in this last case seems to settle the general law to be that the bank holding the discounted note bona fide and for value is not obliged to apply the deposits of its immediate indorser before bringing suit against the maker and those principally bound, and it is by the general law that the United States courts must decide this case."

It is stated in the annotations to that case as follows at page 578:

"The accepted rule in most jurisdictions is that while a bank which is the holder of a note or bill of exchange may, if it chooses to do so, apply to its payment the funds of an indorser or other person secondarily liable on the instrument, on deposit with the bank, it is under no obligation or duty, either towards other

indorsers or the person primarily liable, to apply such deposit in payment of the instrument." citing numerous authorities.

■ We find no evidence to support defendant's theory that plaintiff took the draft as collateral, although the plaintiff had a collateral account with the Bank of Kenton and the agreement referred to above in regard to the same, hence the court was not required to instruct the jury in regard to such collateral or admit the testimony produced or offered regarding the collateral: *Quinn v. Hawley Pulp & Paper Co.,* 85 Or. 630, 635 (167 Pac. 571); *Crossen v. Grandy,* 42 Or. 282, 287 (70 Pac. 906); *Haines v. First National Bank,* 89 Or. 42 (172 Pac 505); *Lewis v. Craft,* 39 Or. 305 (Pac. 809).

Assignments numbers 2 and 3 challenge the correctness of the charge of the court to the jury. The pivotal question in this case, which was submitted to the jury, was whether or not the plaintiff was a holder in due course of the draft.

The Negotiable Instruments Law provides as follows: (§ 7844, O. L.)

"A holder in due course is a holder who has taken the instrument under the following conditions: (1) that it is complete and regular upon its face; (2) that he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact; (3) that he took it in good faith and for value; (4) that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Section 7848, O. L., reads as follows:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must

have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith.''

Section 7849, O. L., reads as follows:

''A holder in due course holds the instrument free from any defect of title of prior parties, and free from defenses available to prior parties among themselves, and may enforce payment of the instrument for the full amount thereof against all parties liable thereon.''

Section 7851, O. L., reads thus:

''Every holder is deemed prima facie to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he, or some person under whom he claims, acquired the title as a holder in due course; but the last mentioned rule does not apply in favor of a party who became bound on the instrument prior to the acquisition of such defective title.''

The court instructed the jury in detail and thoroughly explained the law according to the Negotiable Instrument act.

■ In order to show whether or not the main question in this case was fairly submitted to the jury by the charge of the court, we quote a portion of the charge. The defendant asserts that the court erred in instructing the jury as follows:

''I further instruct you that if you find from a preponderance of the evidence that the Bank of Kenton was hopelessly insolvent on the 30th day of November, 1926, at the time the draft involved in this action was received by it and that the bank had knowledge thereof at the time, and that the defendant had no knowledge thereof but believed the bank solvent, in that event the acceptance of the draft from the defendant by the Bank of Kenton, while it was insolvent, was a fraud upon the defendant and by reason thereof

the Bank of Kenton's title to the draft became defective, and it did not acquire title unless it gave value therefor. And if you find that the Bank of Kenton did not give value therefor and did thereafter transfer the draft by endorsement and delivery to the Bank of California, National Association, the plaintiff herein, the plaintiff would not thereby acquire title to the draft unless it became a holder thereof in due course.

"If, however, the Bank of Kenton officers had reasonable grounds for believing that the bank by continuing could work itself out of its then present predicament, if you find it was in one, then it would not have committed a fraud by the acceptance of the draft."

The instruction quoted is criticized as to the latter part thereof.

There was testimony in the case tending to show that the Bank of Kenton was doing a large business and was a going concern on Nevember 30, 1926, when the draft was received by it. In some of the instructions the court used the word "insolvent" in lieu of "predicament" in the sense of financial embarrassment.

Under the facts in the case, we do not think that the instruction was in any way prejudicial to the defendant. The court plainly told the jury that when a bank is insolvent it should decline to receive further deposits and discontinue business and, if under such circumstances it continues to receive deposits, it is a fraud on depositors and title of the deposits so received remain in the depositor.

■ The charge of the court is criticized by defendant, a part of which, after explaining that the person to whom a negotiable instrument is transferred must have actual knowledge of the infirmity or defect, or knowledge of such facts that its action in taking the instrument amounted to bad faith, and referring to the

defect claimed that the Bank of Kenton had no title to the draft, for the reason it was hopelessly insolvent, using the word "hopelessly" as employed in the answer of defendant, instructed the jury as follows:

"Unless the defendant has proved to your satisfaction that said bank was hopelessly insolvent on November 30, 1926, and known to be so by its officers, and that they had no belief or reasonable grounds of expectation of bettering its condition and continuing business and (you find) that the Bank of California had knowledge of the fact of hopeless insolvency, if it was a fact, or had knowledge of such facts that its action in taking the draft amounted to bad faith, you should return a verdict for the plaintiff." (words "you find" inserted by writer.)

The defendant contends this charge placed the burden upon the defendant of showing that the Bank of California had knowledge of the insolvency of the Bank of Kenton, or had knowledge of such facts that its action in taking the draft amounted to bad faith.

Considering the whole charge of the court, such meaning could not have been conveyed to the jury. What was undoubtedly meant was that in the first instance it was incumbent upon the defendant to show that the title of the Bank of Kenton to the draft was defective, and it should appear that the Bank of California had knowledge thereof, or had knowledge of such facts that its action in taking the draft amounted to bad faith.

■ Instructions are to be read together and taken as a whole, and where the court gave a correct exposition of the law the judgment will not be reversed because some paragraph, or part of a paragraph, considered alone, may be subject to criticism: *Powder Valley State Bank v. Hudelson*, 74 Or. 191, 205 (144 Pac. 494); *Hinton v. Roethler*, 90 Or. 440 (177 Pac. 59);

*Rorvik v. N. P. Lumb. Co.,* 99 Or. 58, 83 (190 Pac. 331; 195 Pac. 43) ; *Snow v. Beard,* 82 Or. 518, 539 (162 Pac. 288) ; *1st U. S. Bank v. U. S. Nat. Bank,* 100 Or. 282, 284 (197 Pac. 547).

The diction and punctuation are not perfect, but if the words "you find" which we have inserted in parentheses in quoting the instruction were included the instruction would be perfect. The court did not use the words "burden of the proof" in this part of the charge. Later in the instruction to the jury, the court three several times, in connection with other matters, plainly told the jury in substance, that if they found:

"From a preponderance of the evidence that the draft was obtained by the Bank of Kenton fraudulently as alleged in the defendant's answer, in that event the burden is upon the plaintiff to show by a preponderance of the evidence that it obtained the draft for value and in good faith."

The lengthy instructions to the jury, containing some eight thousand words, were marshalled by the court in the following plain and concise language:

"Now, in summing up these long and rather tedious instructions, let me suggest that you proceed in this manner:

"When the plaintiff presented the draft here, as I said before, regular on its face, and proved that the same had been presented, then that put the burden upon the defendant of going ahead. When the defendant then satisfied your minds, if it satisfied them, that the Bank of Kenton was insolvent at the time it took its draft, then that put the burden upon the plaintiff to show you that it acted in good faith, for the reason, if it had knowledge of the insolvency, it could not take title, because the Bank of Kenton did not get title. If it had knowledge of such facts as amounted to bad faith, it could not take title. And the law is, when the defendant showed, if it did show, that the bank was insolvent and that the drawer of the draft did not

know it but believed it to be solvent when it put the draft in there, no title passed to the Bank of Kenton. However, the Bank of Kenton could negotiate it to a person who knew nothing about the condition and convey a good title. For that reason, if the defendant has satisfied your minds of the insolvency at the time it received the draft, then the plaintiff, Bank of California, takes up the question there, and it proves to you, if it can, that it acted in good faith in the matter.

"If it has produced by a preponderance of the evidence proof to your satisfaction, as I said before, by a preponderance of the evidence, then your verdict should be for the plaintiff. If it has failed to show the good faith of the situation, then your verdict should be for the defendant, if you are satisfied that the Bank of Kenton was insolvent.

"Now, that is plainly and simply the issue. I give you that summing up in connection with all of the other instructions, however."

Wherever the summary may appear to be somewhat general, it must be remembered that the law had all been explained in prior details. See *Bank v. Kerley*, 109 Or. 155, 205 (220 Pac. 116).

The record shows that the plaintiff assumed the burden and introduced testimony tending to show that it acquired title to the draft in due course; that it became the holder of the draft before it was overdue; that it was regular upon its face and that it took it in good faith and for value; that at the time it received the draft it had no notice of any infirmity in the instrument or defect in the title of the Bank of Kenton which negotiated it to plaintiff.

We think the instruction of the court plainly and fairly submitted the questions at issue to the jury.

The testimony indicates that at about 2 o'clock p. m., November 30, 1926, when plaintiff obtained the draft, the books of the Bank of Kenton showed the bank

to be solvent. After investigation, pursued for several months after the Bank of Kenton closed its doors, neither the deputy of the superintendent of banks nor a professional accountant employed in such investigation, nor the assistant cashier of the Bank of Kenton could state positively whether or not it was insolvent on November 30, 1926.

If at that time plaintiff had made further inquiry as to the condition of the Bank of Kenton, insolvency would probably not have been disclosed.

In *Fidelity & Deposit Co. v. Kelso State Bank*, 287 Fed. 828, the Kelso (Wn.) bank closed its doors March 17, 1921. It was claimed that on March 9 and 14, when Cowlitz county treasurer made deposits of county funds the bank was hopelessly insolvent and its officers knew thereof. The action was by the indemnitor of the county treasurer to recover said deposits. Distinguished counsel from Portland and from Vancouver, Washington, appeared in the case, and Judge Gilbert, who wrote the majority opinion, said at page 830:

"There is no imputation of knowledge of insolvency in aid of the recovery of deposits received by an insolvent bank. In such case, in order to charge the bank as trustee ex maleficio, its officers must have had *actual* knowledge of its hopeless insolvency, and it is not enough if by the exercise of reasonable care and diligence they could have discovered it."

Until 4 o'clock p. m. on November 30, 1926, which was about two hours after the deposit in question, the account of the Bank of Kenton with plaintiff presented no unusual nor uncommon features. At 4 o'clock p. m. plaintiff refused payment of a check for $42,512.53 and returned it to the United States National bank, the payee, not wanting to increase the overdraft of the Bank of Kenton to over $50,000, which would have re-

sulted had the check been paid, but expecting the Bank of Kenton to effect the proper arrangement for taking up the check next day. At about 10 o'clock next day J. V. Burke, manager of the Bank of Kenton, obtained for his bank a loan of $50,000 from plaintiff. He said "That is all I need, that puts me in good shape to take care of my checks. I don't need any more." In referring to the $42,512.53 check he said that it would never happen again. Two of the directors, Heusner, a watchful officer, and Edwards stated at the same time that they knew of no trouble or of anything wrong with the Bank of Kenton.

██ The strictness of the general equity doctrine of constructive notice is not applied to a purchaser for value of negotiable instruments before maturity. Such purchaser is not "put upon inquiry" by suspicion, by knowledge of such facts as ought to put an ordinarily prudent man upon inquiry, nor by negligence. He is not required to busy himself inquiring about infirmities or searching for defects. Only knowledge of such facts as would make his purchase an act of bad faith is sufficient to impeach his title as a holder in due course. Prudence is not the criterion: *First Nat. Bank v. Moore,* 148 Fed. 953; *Amalgamated Sug. Co. v. U. S. Nat. Bank,* 187 Fed. 746; *Bank of Jordan Valley v. Duncan,* 105 Or. 105 (209 Pac. 149); *Downs v. Horton,* 287 Mo. 414 (230 S. W. 103, Aff'd. 209 S. W. 595), 3 RCL, §§ 277, 278, pp. 1071, 1074. The question is one of good faith or bad faith, honesty or dishonesty: *Bowman v. Metzger,* 27 Or. 23, 29, 31 (39 Pac. 3); Brannan's Neg. Insts. Law, 4 Ed. pp. 446, 452.

██ It may take only one word to indicate the real inside condition of decay of the Bank of Kenton at the time the draft was negotiated to the plaintiff bank, but the main question in the case which was solved by the

jury was what knowledge or notice the plaintiff had at the time of the actual condition thereof, so as to impute to it bad faith in the transaction, or whether plaintiff had actual knowledge of any defect or infirmity in the instrument. The plaintiff assumed the burden of proving that it acquired the title to the instrument as a holder in due course. The testimony in this regard was ample to carry the case to the jury. It was submitted to them under appropriate instruction and the finding of the jury forecloses the question. The defendant asserts that the draft in question was taken as a preference. Under the testimony and record in the case we do not think that this claim requires consideration.

■ Defendant asserts error of the court in instructing the jury that "bad faith" and "fraud" are synonymous. This point is practically covered, we think, but if the Bank of Kenton practiced fraud and deceit upon defendant it got no title to the draft: § 7847, O. L. If the plaintiff did not know of the fraud or did not participate in the result, under such circumstances as to make it a party to the fraud, it got good title to the draft: § 7848, O. L. The expression "bad faith" in the latter section appears to be synonymous with "fraud" because it involves the element of dishonesty. "Honesty" is good faith. "Dishonesty" is bad faith: *Bowman v. Metzger*, supra; *Mills v. Keep*, 197 Fed. 360, 366; *Hilgenberg v. Northup*, 134 Ind. 92 (33 N. E. 786); *Benton v. Sikyta*, 84 Neb. 808 (24 L. R. A. N. S. 1057, 1061).

We have given the record in this case careful examination and consideration, more than this memorandum suggests, and find no reversible error therein. The judgment of the trial court is therefore affirmed.

BROWN and BELT, JJ., absent.