Argued December 5, 1973, reversed February 14; petition
for rehearing denied March 19, 1974

STARR, *Respondent and Cross-Appellant, v.*
BROTHERHOOD'S RELIEF AND COMPEN-
SATION FUND, *Appellant and Cross-Respondent.*
518 P2d 1321

*Craig E. Iverson,* Portland, argued the cause for appellant. With him on the briefs were James C. Dezendorf, and Dezendorf, Spears, Lubersky & Campbell, Portland.

*Don G. Swink,* Portland, argued the cause and filed briefs for respondent.

Before O'CONNELL, Chief Justice, and MCALLISTER, DENECKE, HOLMAN, TONGUE, and BRYSON, Justices.

HOLMAN, J.

This is an action by a railroad employee for benefits claimed to be due to him as a member of defendant relief and compensation fund after he had been held out of service by his railroad employer. The case was tried before the court, without a jury. Defendant appeals from a judgment awarding plaintiff benefits totaling $4,320. Plaintiff cross-appeals from the denial of his claim for attorney fees.

Defendant's sole assignment of error is that the trial court erred in denying defendant's motion for a directed verdict on the ground that the evidence conclusively established that (1) plaintiff had refused to perform services for his employer, and (2) defendant's membership agreement prohibited payment of any benefits where an employee was held out of service as the result of such a refusal.

The judgment of the trial court was based upon findings to the effect that the term "held out of service" is defined in defendant's membership agreement to include all cases in which a railroad employee has been held out of service by his employer except cases "of any willful or intentional violation or infraction of any order * * * rule * * * or regulation * * * of his employer," and that although plaintiff refused to perform services for his employer, he did so "in good faith," and did not do so "willfully."

Because this is an action at law we must af-

firm the trial court if its findings are based upon any substantial evidence. In reviewing the evidence we must also bear in mind that in such a case plaintiff is entitled to have the evidence viewed in the light most favorable to him, including all reasonable inferences from the evidence and with all conflicts in the testimony resolved in his favor. *Archer v. Rogers Construction*, 252 Or 165, 169, 447 P2d 380 (1968).

Plaintiff was employed by the Union Pacific Railroad as a freight conductor. As such he was responsible for the safe operation of the train and for all employees on it. For that purpose he was required to know and to obey all the general Safety Instructions and all Operating Rules of the railroad, as well as all Bulletin Orders, among other things. The railroad division superintendent, Mr. Hardin, had authority to issue and to cancel such Bulletin Orders.

In late September 1971, Mr. Hardin received the following letter from a local union:

"* * * * *.

"The Officers and Members of Local 1304 protest the locating mechanical refers [sic] and trailers in the consist of a train next to or near cabooses in which potent toxic fumes from these type cars will endanger the health and or safety of train crews.

"This local would appreciate your cooperation in this matter by issuing instructions to all concerned that such cars or trailers emitting potent toxic fumes be cut in a sufficient distance ahead of cabooses to prevent such fumes from entering cabooses.

"* * * * *."

As a result, Bulletin Order No. A-47 was issued on October 5, 1971. It provided that:

"Perishable loads in mechanical refrigerator

cars and trailers must be entrained not less than 5 cars ahead of caboose, number of cars permitting."

This order, and the circumstances under which it was canceled one week later, on October 12, 1971, gave rise to the controversy which resulted in this case.

On that day plaintiff was instructed to take a freight train from The Dalles to Hinkle, a distance of some 100 miles. When the train came into The Dalles from Portland plaintiff noticed that a string of five refrigerator cars was separated from the caboose by only three other cars. He then called the yardmaster "to make the necessary switch" in order to comply with the Bulletin Order.

Plaintiff was then notified that Mr. Hardin wanted to talk to him by telephone. In the course of the conversation which followed Mr. Hardin told Mr. Starr that he had canceled Bulletin Order A-47 earlier that day and that no switching was required. Mr. Starr told Mr. Hardin that he was concerned about the hazard of the fumes from the diesel units on the refrigerator cars and his own health and safety. Mr. Hardin told Mr. Starr to take the train out, which Mr. Starr said he would do if the cars were switched so as to comply with order A-47, but not otherwise. Mr. Hardin then took Mr. Starr out of service and another conductor was instructed to take the train out.

Mr. Starr testified that on from 10 to 15 previous occasions he had suffered from nausea and headaches when riding in the caboose behind reefer cars with diesel refrigeration units "as near as 10 cars * * * depending on the number of them." He also testified that if he became nauseous and got a headache he "didn't feel [he could] remain alert and

attentive and perform the duties that [he was] charged with performing."

Plaintiff also testified that he had never before been given an oral order "to violate a written order" and that under the Operating Rules he was responsible for compliance with the written Bulletin Orders; that he did not "intend to be insubordinate," but was "reluctant to take the train out until * * * the switching had been done that would remove the health and safety question which was of first importance in [his] mind"; that he did not intend to delay the train; and that the switching could have been done in from 10 to 15 minutes.

Union Pacific's Safety Instructions to employees include the following, of which Mr. Starr was aware:

"There is hazard of carbon monoxide fumes from exhaust of diesel or gasoline engines and precautions must be taken to avoid possibility of accident therefrom.

"Exhaust from such engines must not be located in close proximity of fresh air intake of passenger cars and care must be exercised at all times to see that there is sufficient ventilation where such engines are operated." (No. 4115)

"Employes must take every precaution to prevent injury to themselves and other persons under conditions not provided for by the rules.

"Employes must not rely upon the carefulness of others, but must protect themselves when their own safety is affected." (No. 4001)

"In case of doubt or uncertainty the safe course must be taken; in all cases, the safest available methods must be followed." (No. 4000)

These general Safety Instructions were promulgated by the Vice President in Charge of Operations in 1954.

The Safety Instructions are preceded by a certification containing the following:

"Special instructions may be issued by proper officer."

Pursuant to the same subject, the railroader's bible, the Consolidated Code of Operating Rules, under Rule 109, contains the following information:

"*Superintendents'* bulletins or general *orders* containing information *affecting the* movement or *safety of trains* and engines *will be issued and cancelled by the Superintendent* and will be posted at locations designated in the timetable.

"\* \* \* \* \*." (Emphasis ours.)

Thus, the superintendent had authority to supplement the general Safety Instructions as applied to particular circumstances with his own orders and to cancel such orders as he made when he deemed cancellation appropriate.

Following an investigation and hearing, Mr. Starr was discharged. He then made application to defendant for payment of "held out of service" benefits. Defendant denied his application upon the ground that it "does not come within the provisions of our Constitution," referring specifically to Article XII, (sec. 4), and Article XXXI, (sec. 1-a).

Article XII, (sec. 4), of defendant's constitution provides:

"Members shall not be eligible for any benefits or compensation whatsoever for 'held out of service,' *as hereinafter defined* where such claim is based in whole or part upon refusal to perform any duty or service for the employer, \* \* \*." (Emphasis added.)

Article XXXI—Definitions—(sec. 1-a) provides:

"The term 'Held out of Service' as used in this

Constitution, *shall include all cases,* where an employee * * * has been * * * relieved by his employer from the performance of his said usual duties as *discipline for * * * offenses, not,* however, *because of any willful or intentional violation* or infraction of any order * * * rule * * * or regulations, expressed or implied, of his employer * * *." (Emphasis added.)

After exhausting his remedies of appeal as provided by defendant's constitution, plaintiff filed his complaint in this action. Defendant, by its answer, alleged as an affirmative defense that

"Plaintiff is not entitled to any benefits for being held out of service under defendant's membership agreement and constitution, since his conduct constituted *insubordination, a refusal to perform services, and a wilful violation of an order,* all of which expressly preclude recovery of any benefits under defendant's membership agreement and constitution." (Emphasis added.)

Contrary to the contention of defendant, the trial judge read the two constitutional provisions together to the effect that because "held out of service" benefits were payable even in cases involving "discipline for offense" unless the offense involved a "willful or intentional violation" of an order, rule or regulation, it followed that a member who failed to perform a duty was eligible for "held out of service" benefits unless he "willfully or intentionally" violated some order, rule or regulation. We agree with such an interpretation. The document, in this respect, is a model of ambiguity, but we believe it was its intention to provide for benefits when the employer prevented a member from working as discipline for an infraction except in those cases where the infraction was "willful or intentional."

■ A glance at Black's Law Dictionary 1773-774

(4th ed 1951) and the cases cited thereunder shows that the word "willful," when used in connection with criminal offenses involving moral turpitude, denotes bad intent. However, more often it describes an act as being one which is committed intentionally and knowingly, and distinguishes such an act from that which is committed negligently or heedlessly. It seems to us that the latter meaning is the only reasonable one that could be ascribed to the use of the language in the present case. First, it is used in the disjunctive together with the word "intentional." It would make no sense to use "willful" in the sense of malice or bad intent when its use is accompanied by an alternative which requires that the covered employee's refusal need only be intentional to disqualify him from benefits. One of the recognized meanings of the word "willful" is "intentional," and when both words are used together, as in this instance, we believe that "intentional" is the only meaning which was intended to be given to the word "willful."

In addition, the particular context in which a word is used is usually the key to the meaning intended. In the present context, the word in question is being used to distinguish two different kinds of offenses against authority, the distinction being the basis for determining whether an employee who is being disciplined by being relieved of his employment should draw benefits. In such a context, it would be reasonable to distinguish those who intentionally violated an order or regulation from those who negligently or inadvertently did so. It would also be improbable that the determining factor was intended to be the motive for the infraction because such an issue would be entirely subjective and, therefore, difficult of definite ascertainment. It is our belief that the in-

tention of the document in question was to pay benefits to those who were taken out of service as discipline for negligent or heedless infractions and not to pay benefits to those who intentionally disobeyed orders or regulations. It is perfectly logical to distinguish between the person who inadvertently goes to sleep on the job and one who intentionally takes a nap even though no moral turpitude was involved in either case.

The use of the word "willful" in the present context denotes nothing more than the failure by plaintiff to obey an order which he knew the superintendent had the authority to give, and the plaintiff's good intentions, high motives, and belief that the superintendent was wrong in his analysis of the danger of the situation are entirely irrelevant. Even the employees in constituting their fund must have understood that you cannot run a railroad by giving every employee the choice of carrying out an order depending upon whether he believes the order is a good one or not and, therefore, they would not put a premium upon intentional disobeyal of orders, even for good motives.

Therefore, we must examine the testimony to determine whether there is any evidence from which the trial court could find that plaintiff honestly believed the superintendent did not have the authority to give the order. There is no argument about whether plaintiff disobeyed an order. The railroad division superintendent directed him to take out the train without changing the position of the refrigerator cars in relation to the caboose, and plaintiff refused to do so. The only excuse he could have for not obeying the order which would bring him within the coverage of the policy is a belief that the superintendent did not have the authority to direct him to take out the train as it was presently made up.

It is contended that the general Safety Instructions were put out by an authority higher than that possessed by the superintendent and that they formed a basis for a rational belief by plaintiff that he did not have to obey the superintendent's order because it was, in the opinion of plaintiff, in contravention of the Safety Instructions. We have a situation in which both the superintendent and the plaintiff looked at the same factual circumstances at the same time, one deciding that it was not dangerous to take out the train as it was presently constituted and the other deciding that it was dangerous. We do not conceive that anyone in such a situation could rationally believe the conductor's evaluation was intended by the Safety Instructions and the Operating Rules to be paramount. When read together, the Safety Instructions and the Operating Rules clearly bestow upon the superintendent the authority to evaluate special situations in view of the Safety Instructions and to make orders for the operation of trains in such situations in accordance with his judgment. Could anyone really believe that a railroad could be operated in any other way?

The superintendent issued his original order only one week prior to the occurrence here under consideration. It was done as the result of an application from the union. In the absence of evidence that separation of refrigerator cars from the caboose had been *required* by the railroad in order to comply with its Safety Instructions during the 17-year period between their adoption and the superintendent's order, it can only be concluded that previously it had not been contemplated that the general Safety Instructions *required* such removal; otherwise, the application for an order

directing such removal and its issuance would have been unnecessary.

Plaintiff is forced to the position that if he had a good motive in refusing to obey the order, his disobeyal was not "willful or intentional." His own testimony shows he was aware the superintendent had authority to issue and retract the order. Plaintiff testified:

"Q. Do you know who issued that bulletin you were relying on? That would be who?

"A. R. B. Hardin.

"Q. Same man talking to you?

"A. Yes.

"Q. And did you know at the time you were talking to him he was the person that had issued and retracted such bulletin?

"A. Yes.

"Q. Would it be fair to say he was the only one that had that authority?

"A. Yes.

"Q. And you were aware of that at that time?

"A. Yes."

■ The trial court seemed to find some help in the fact that there was evidence from which it could be inferred that the superintendent made up his mind to revoke his prior order at the time he talked to plaintiff. Such inference is irrelevant to the issue at hand. If the superintendent had the authority to revoke the order, he had the authority to revoke it at the time he talked to plaintiff or at any other time.

■ The trial court also attached some importance to the fact that the superintendent's revocation of the order was oral. Plaintiff points to no basis for believ-

ing the superintendent could not do so except that plaintiff had never before been given an oral order countermanding a written order. This is an insufficient basis for a rational belief that the superintendent could not orally countermand a written order.

■ It is our conclusion that the evidence forms no basis for a finding that plaintiff did not "willfully or intentionally" fail to carry out an order of the superintendent and that the evidence requires a finding that he did so fail to carry out an order.

The judgment of the trial court is reversed.

TONGUE, J., dissenting.

I must respectfully dissent from the majority opinion because of my belief that: (1) the majority gives the term "willfully or intentionally" a meaning more limited than is proper for the purposes of this case, and (2) the majority fails to recognize that whether plaintiff acted "willfully or intentionally" is a question of fact upon which there was substantial evidence to support the finding by an able and experienced trial judge.

1. *A refusal to obey an order in good faith belief that the order was improper is not "willful or intentional" for the purposes of forfeiting payments due under this unemployment compensation plan.*

First of all, it must be remembered that this is not a discharge case, in which the issue would be whether there was such a refusal to obey an order as to provide sufficient grounds for the discharge of plaintiff. Instead, the issue in this case is whether plaintiff's conduct was such as to forfeit unemployment compensation payments otherwise due to him. In other words, was there a "willful or intentional" re-

fusal within the meaning of the provisions of this unemployment compensation plan?

In seeking the intended meaning of that term for the purpose of this case we must give those words a meaning which is consistent with the purpose or "object" of this "relief and compensation fund," which is stated in defendant's constitution to be:

"* * * the maintenance of a society for beneficial and protective purposes to its members * * *."

The "Certificate of Membership" issued by defendant to plaintiff, and which includes the provisions now in controversy has most, if not all, of the necessary elements of an insurance policy.[1] Plaintiff made regular payments to defendant in accordance with the terms of that "certificate" since 1955. Considering the nature and purpose of this "Brotherhood's Relief and Compensation Fund," I believe that the rules applicable to the construction of ambiguous insurance policies are applicable in this case, to the effect that such ambiguities will be resolved against the defendant and in favor of payment of benefits. Cf. *Farmers Mut. Ins. Co. v. United Pac. Ins. Co.*, 206 Or 298, 305, 292 P2d 492 (1956), and *Reed v. Commercial Ins. Co.*, 248 Or 152, 156, 432 P2d 691 (1967).

It has been recognized by this court that the term "willfully" is a word of many meanings, depending upon the purpose for which the word is used in a particular context. *Falls v. Mortensen*, 207 Or 130, 143-44, 295 P2d 182 (1956).

Thus, when used for some purposes and in some contexts, the word "willfully" means with a "bad intent" or "an evil mind." *State v. O'Malley*, 248 Or

---

[1] See following page.

⊙ This "certificate" includes the following schedule of "benefits":

## SCHEDULE OF HELD OUT OF SERVICE BENEFITS AND MAXIMUM PERIODS

| Class of Membership: Dues: After a continuous beneficial membership of: | REGULAR $2.00 | | | EXTRA $2.00 | | | BIG NINE $3.00 | | | SPECIAL $4.00 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rate Per Day | No. of Maximum Days | Maximum Aggregate Benefits | Rate Per Day | No. of Maximum Days | Maximum Aggregate Benefits | Rate Per Day | No. of Maximum Days | Maximum Aggregate Benefits | Rate Per Day | No. of Maximum Days | Maximum Aggregate Benefits |
| A. Less than 18 months | $6.00 | 100 | $600.00 | $6.00 | 100 | $600.00 | $9.00 | 100 | $900.00 | $12.00 | 100 | $1,200.00 |
| B. 18 months or more but less than 24 months | 6.00 | 160 | 960.00 | 6.00 | 160 | 960.00 | 9.00 | 160 | 1,440.00 | 12.00 | 160 | 1,920.00 |
| C. 24 months or more but less than 48 months | 6.00 | 200 | 1,200.00 | 6.00 | 200 | 1,200.00 | 9.00 | 200 | 1,800.00 | 12.00 | 200 | 2,400.00 |
| D. 48 months or more but less than 60 months | 6.00 | 220 | 1,320.00 | 6.00 | 220 | 1,320.00 | 9.00 | 220 | 1,980.00 | 12.00 | 220 | 2,640.00 |
| E. 60 months or more | 6.00 | 240 | 1,440.00 | 6.00 | 240 | 1,440.00 | 9.00 | 240 | 2,160.00 | 12.00 | 240 | 2,880.00 |

Claims must be filed within 90 days of first day held out of service. When filing claims, be sure to furnish first date held out of service.

601, 605, 435 P2d 812 (1968), and *Chaffin v. Chaffin,* 239 Or 374, 387, 397 P2d 771 (1964). Accordingly, under a statute imposing a penalty upon an employer who "willfully" fails to pay his employee's wages, we held that "The statute was not intended to impose liability where the employer's refusal to pay wages is *based upon a bona fide belief* that he is not obligated to pay them." (Emphasis added) *State ex rel Nilsen v. Lee,* 251 Or 284, 293, 444 P2d 548 (1968).

The word "willfully" has been held to have a similar meaning in the field of labor relations when applied to employees who have "willfully" failed to use a safety device or to perform a duty required by statute. *Wise-Buchanan Coal Co. v. Ray,* 157 Okla 197, 17 P2d 360, 361 (1932), and *Pacific Indemnity Insurance Co. v. Eberhardt,* 107 Ga App 391, 130 SE2d 136, 138 (1963). Indeed, even in discharge cases for "insubordination," it has been recognized in the field of labor relations that if the work assigned to an employee involves what he believes in good faith to be an unusual danger to his health or safety, his refusal to perform such work may not constitute "insubordination," depending upon the circumstances. See Stone, Labor-Management Contracts at Work, 212 (1961), and *Halstead Metal Products, Inc.,* 49 L A 325 (1967).

Employees who have made monthly payments into a fund established for the purpose of providing what amounts to unemployment compensation when they are "held out of service" by their employer are entitled to a broad and liberal interpretation of such terms so as to promote, rather than to defeat, the purposes of such a "fund."

Considering the purposes of this "fund" and the context in which the word "willfully" is used in defendant's constitution, I believe that if, as contended

by plaintiff, he had a bona fide belief that he was not obligated to take out this train unless the refrigerator cars were switched so as to be further from the caboose, he was not guilty of a "willful violation of an order" or of a "willful" refusal to perform service, so as to bar him from recovery of "out of service" benefits.

I fully recognize that the "certificate" in this case does not use the term "willful" alone, but uses the words "willful or intentional." The majority, however, refuses to give any separate meaning to the term "willful" and holds that " 'intentional' is the only meaning which was intended to be given to the word 'willful.' "

Such a narrow interpretation, in my opinion, is not only inconsistent with the purposes of this fund, but with the interpretation which the defendant itself apparently placed upon these words by its position in this case. Thus, defendant has not contended, as the majority holds, that "willful" means no more than "intentional." Instead, defendant's answer expressly alleged that plaintiff's conduct was "constituted insubordination, a refusal to perform services, and a *wilful* violation of an order."

In any event, the term "intentional" is also a word of many meanings, depending upon the context in which it is used. For example, when used in connection with the doing of a wrongful act, the word "intentional" has been held to mean that the person intended not only to do the particular act, but to do it *knowing at the time it was wrongful.* See 46 CJS 1106, Intentional. To the same effect, see *Horger v. Flagg, Utilities Commissioner,* 185 Or 109, 132, 201 P2d 515, 202 P2d 526 (1949). See also *Richards v. Griffith Rubber Mills,* 300 F Supp 338, 341 (DC Or

1969), in which the court held that for the purposes of the Federal Equal Employment Opportunity Act the word "intentionally" means "wilfully and knowingly." Given such a meaning, as held in these cases, the doing of a wrongful act would not be "intentional" if done in the good faith belief that it was not wrong to do such an act.

For these reasons, I disagree with the interpretation of this "certificate" by the majority and agree with the trial judge in his holding to the effect that if plaintiff acted in "good faith" he did not act "wilfully or intentionally" within the intended meaning of those terms, as used in this unemployment compensation plan.

2. *There was substantial evidence to support the finding of fact by the trial judge that plaintiff did not "willfully or intentionally" violate an order.*

(a) *Under the test adopted by the majority.*

The majority, after holding that "willful" means no more than "intentional," holds that:

"* * * we must examine the testimony to determine whether there is any evidence from which the trial court could find that plaintiff *honestly believed* the superintendent did not have the *authority* to give the order. * * * The only excuse he could have for not obeying the order which would bring him within the coverage of the policy is a belief that the superintendent did not have the authority to direct him to take out the train as it was presently made up." (Emphasis added)

This conclusion is apparently reached by the reasoning that otherwise:

"* * * We have a situation in which both the superintendent and the plaintiff looked at the same

factual circumstances at the same time, one deciding that it was not dangerous to take out the train as it was presently constituted and the other deciding that it was dangerous. * * *"

and by asking the rhetorical question:

"Could anyone really believe that a railroad could be operated in any other way?"

Again, however, we must recognize that this is not a discharge case. Assuming the right of Mr. Hardin to discharge a train conductor who had temerity to disagree with him, it does not follow that the train conductor could not have "honestly believed" that Mr. Hardin did not have authority to *require him* to take out a train made up in a manner which was considered to be unsafe by the plaintiff who, as the conductor (like the master of a ship) was the person who was responsible for the safety of the train.

Thus, even under the test adopted by the majority, if there was any substantial evidence to support a finding by a trial judge or jury that plaintiff in fact had the "honest belief" that the superintendent did not have the authority to require him to take out the train as it was presently made up, the trial court must be affirmed.

The majority says that Mr. Hardin had authority to "supplement" the company "Safety Instructions" with his own "orders" and also to cancel such "orders." It does not follow, however, that a district superintendent such as Mr. Hardin had authority to change or diminish the requirements of these printed company-wide "Safety Instructions." And even if Mr. Hardin had such authority it does not follow that plaintiff, as the conductor with responsibility for the safety of a train, could not have "honestly believed"

that Mr. Hardin had no authority to require him to take out a train which he believed to be made up in violation of these "Safety Instructions."

Prior to the issuance of Bulletin Order A-47 in 1971, there had been several instances during 1970 in which, because of this hazard, the plaintiff, as the conductor, had required refrigerator cars to be switched to a position farther ahead of the caboose. The trial court could reasonably infer that the "Safety Instructions" provided the basis for that action, and a "rational basis" for doing so.

The trial court could also reasonably infer from the evidence that Bulletin Order A-47 (which was issued in 1971 in response to a union complaint) was intended to do no more than to implement these general "Safety Instructions" by specifying a particular number of car lengths for the purposes of those general rules.

In any event, a trial judge or jury could properly find that it would have been "rational" for a "reasonable" conductor, with responsibility of the train and its crew, to believe that although Mr. Hardin had authority to cancel Bulletin Order A-47, nevertheless, and because he was no more than a district superintendent, Mr. Hardin had no authority to change the general "Safety Instructions," and that upon the cancellation of Bulletin Order A-47 the matter stood as it had been in 1970, during which refrigerator cars had been switched by plaintiff on several occasions out of concern for the hazard involved and as the "safest course [which] must be taken."

Accordingly, if a conductor was ordered by Mr. Hardin to take out a freight train with ten diesel refrigerator cars emitting diesel fumes immediately in

front of the caboose, a trial judge or jury could properly find that the conductor at least *could* have a *bona fide belief* that the superintendent had no authority to require him to take out the train and that under the general "Safety Instructions" and as the conductor responsible for the safety of the train he could decline to take it out unless the refrigerator cars were switched, as the "safest course" which "must be taken."

While the facts of this case may not be so aggravated, I nevertheless believe that the trial judge, as the trier of the facts, could have properly found from the evidence in this case that there was a rational basis upon which plaintiff, as the conductor responsible for the safety of this train, could have entertained such a belief.

There was testimony that the train, as made up, included five refrigerator cars, with the diesel or gasoline engines running on all five of them, and separated from the caboose by three other cars instead of five other cars, as had been required by Bulletin Order A-47. The testimony of Mr. Starr included the following:

"Q Did you rely upon either or any of those rules at that time in making your decision not to take the train? Did you refer to any of them at that time?

"* * * * *

"A Yes.

"* * * * *

"Q And will you read Instruction No. 4000, please.

"* * * * *

"A (Reading) 'Employes must take every precaution to prevent injury to themselves and other persons under conditions not provided for by the rules.

" 'Employes must not rely upon the carefulness of others, but must protect themselves when their own safety is affected.' "

"* * * *

"A    Okay.  Rule 4115.

(Reading) " 'There is hazard of carbon monoxide fumes from exhaust of diesel or gasoline engines and precautions must be taken to avoid possibility of accident therefrom.

" 'Exhaust from such engines must not be located in close proximity of fresh air intake or passenger cars and care must be exercised at all times to see that there is sufficient ventilation where such engines are operated.' "

"Q    Were you aware of all these?
"A    Yes.

"Q    Now, how many of those refrigerator cars were in tandem there ahead of your caboose three cars?
"A    Five.

"Q    And were the engines running on all five of them when the train passed you?
"A    Yes, they were."

"* * * *

"Q    Well now, exactly what, you thought at this time that your health was in danger or you didn't want to take the train because you didn't feel the train complied with the bulletin; now which?
"A    I felt my health and safety was in danger."

"* * * *

"Q    Did you in any way intend or were you in any way insubordinate to Mr. Hardin?
"A    No, I don't feel that I was.

"Q    All right.  Did you refuse to take the train out?
"A    I was reluctant to take the train out until —until the switching had been done that would remove the health and safety question which was of first importance in my mind."

. It may be that an appellate court, upon the reading of such a cold record, in the light of hindsight, may believe that this testimony was not worthy of belief. In my opinion, however, a trial judge who had the advantage of observing the plaintiff and his demeanor could have believed that plaintiff, at that time and under these circumstances, had an "honest belief" that the order given to him by Mr. Hardin was in violation of the "Safety Instructions" and that, as a result, Mr. Hardin "did not have the authority to direct him to take out the train as it was presently made up," even under the test adopted by the majority.

(b) *Under the proper test of "good faith."*

In addition, and as previously stated, I believe that the majority has improperly construed the term "willful or intentional" to mean "intentional" and that the trial judge was correct in his holding that the proper test to be applied in determining whether plaintiff acted "willfully or intentionally" was whether or not he acted in "good faith."

The term "good faith," like the terms "willful" and "intentional," is a term which may have varying meanings, depending upon the context in which it is used. The term "good faith" means the opposite of "bad faith" and, at least for many purposes, refers to the actual state of mind of the person involved. Thus, it has been held that "bad faith" is "synonymous with 'fraud' because it involves the element of dishonesty," as distinguished from an "honest" intent or state of mind, as meant by the term "good faith." See *Bk. of Cal. Etc. v. Portland H. & W. Co.,* 131 Or 123, 139, 282 P 99 (1929). Cf. *Wampler v. Palmerton,* 250 Or 65, 81-82, 439 P2d 601 (1968), holding that absence of "good faith," as used for the purposes of that case, required proof of "an intent to take unfair advantage."

This, I believe to be the proper meaning to be given to the terms "good faith" and "bad faith" for the purposes of this case because such a meaning is consistent with the use of the terms "willful" and "intentional," as previously discussed and which I believe to mean, for the purposes of this case, a "bad intent" or an "evil mind."

All persons are entitled to the benefit of the presumption that they are innocent of crime or wrong. ORS 41.360 (1). By statute in Oregon this presumption is declared to be "indirect evidence." ORS 41.310. Although "bad faith" or fraud can be inferred from circumstantial evidence, the burden of proof to establish bad faith or fraud is upon the party who charges it, and by clear and convincing evidence.

Upon application of these standards, I do not believe that it can properly be said that there was no substantial evidence to support the finding of fact by the trial court that in refusing to take out this train unless the refrigerator cars were switched this plaintiff acted in "good faith" and did not act with a "dishonest," fraudulent, or "bad" intent, or with an "evil mind." It may be that plaintiff's conduct was such as to justify his discharge by the railroad, but it does not follow that his conduct was in "bad faith," so as to deprive him of payments under this unemployment compensation plan.

In my opinion, the ultimate questions in this case are: Did plaintiff lie in his testimony to the effect that he acted in "good faith" and was the trial judge required to find that he lied and acted in "bad faith," instead of finding that he told the truth and acted in "good faith"?

In my opinion, this court cannot properly reverse

90

a trial judge or jury for such a finding of fact.[9] As held in *Everding & Farrell v. Toft*, 82 Or 1, 17-18, 150 P 757, 160 P 1160 (1916), "The question of good or bad faith is peculiarly one for the jury and not for the court * * *."

For all of these reasons I must respectfully dissent.

---

[9] Cf. *dissenting opinion in Palmer v. Van Petten Lumber Co.*, 265 Or 347 at 360, 509 P2d 420 at 427 (1973).