Argued and submitted August 30, 1982, affirmed in part, reversed in part and
remanded with instructions May 11, reconsideration denied June 24, petition for
review denied August 16, 1983 (295 Or 541)

SHOOK et ux,
*Respondents,*
*v.*
TRAVELODGE OF OREGON, INC.,
*Appellant.*

(78-601-L; CA A23336)
663 P2d 1280

Jeffrey M. Batchelor, Portland, argued the cause for appellant. With him on the briefs were George L. Kirklin, Craig D. Bachman and Spears, Lubersky, Campbell & Bledsoe, Portland.

Wally P. Martin, Grants Pass, argued the cause for respondents. With him on the brief was Martin & Wolke, Grants Pass.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

WARREN, J.

## WARREN, J.

Defendant appeals from a judgment awarding Shooks (plaintiffs)[1] $21,000 in damages for defendant's breach of a joint venture agreement. Defendant moved for judgment after all parties had rested and assigns error to the trial court's denial of the motion. The motion was based essentially on assertions that the evidence was insufficient to create a question of fact that (1) defendant had breached the joint venture agreement or (2) plaintiffs were damaged by defendant's actions. We affirm the trial court's finding that defendant breached the agreement but reverse and remand for a determination of damages.

This action arose out of defendant's refusal to approve the terms of a proposed sale of the Shooks' interest in a motel to Frederick and Helen Eggen. In 1961, the parties entered a joint venture agreement, under which plaintiffs owned a 25 percent interest and defendant owned a 50 percent interest in a motel.[2] The portion of the agreement at issue provided:

"* * * [Defendant] shall have the right to investigate and approve of a buyer of [plaintiffs'] interest before entering into a joint venture agreement with such person. Such approval shall not be arbitrarily withheld."

In the spring of 1973, plaintiffs decided to sell their interest in the motel because of their ill health, desire to retire and disagreements with defendant concerning the operation of the motel. John Stone, then defendant's assistant corporate counsel, wrote a letter to plaintiffs concerning the sale of their interest. It stated, in part:

"One of the few requirements TraveLodge considers imposing on the sales agreement itself, is that of attempting to assure itself the new purchaser has a reasonable opportunity of meeting their payment obligations. In other words, cash distributions over and above the 10% management fee should, historically, have proven to be sufficient to meet any monthly or annual note payments the purchaser will be required to make to the seller."

---

[1] The Shooks', Mazottas' and Leal's cause of action for an accounting was dismissed with prejudice, on stipulation.

[2] The Mazottas and Leal also owned a 25-percent interest.

On July 14, 1977, the Eggens offered to purchase plaintiffs' interest for $150,000, to be paid as follows: $45,000 down and the balance at 8 percent interest over approximately 15 years in monthly payments of $1,003.50. Plaintiffs accepted the offer, because its terms satisfied their two financial requirements for the sale terms: the reduction of tax on the sale by qualifying for installment sale treatment and the production of $1,000 per month of retirement income.

On July 22, 1977, Stone informed plaintiffs that the terms of the sale did not comply with defendant's cash flow guidelines. The expected cash distribution of $666 per month from the motel to the new purchasers would not fully cover the purchasers' monthly obligation to the sellers. Stone suggested that plaintiffs restructure the sale terms to comply with the cash flow guidelines. Stone knew that the largest down payment plaintiffs could accept and still qualify for installment sale tax treatment was $45,000. He suggested that plaintiffs either accept the purchase price in cash payments over a few years or accept $75,000 to $80,000 in cash payments over the first two years of the sale and the balance in monthly payments of approximately $666 for 15 years.

On July 27, 1977, Brown, plaintiffs' lawyer, contacted Stone. The contents of that conversation are disputed. Brown testified that he informed Stone that plaintiffs did not believe that defendant could require that the sale terms conform to the cash flow guidelines. He also testified that Stone said that the cash flow guidelines must be followed even if the Eggens, or any other buyer, were independently wealthy and had income from sources other than the motel cash distributions. Stone, on the contrary, testified that he informed Brown that defendant's only concern was the Eggens' ability to make the monthly payments and that if the Eggens were independently wealthy, defendant would not impose its cash flow guidelines on the sale terms.

Plaintiffs refused to renegotiate the terms of the sale for two reasons. First, they believed that defendant had no right to require that the sale terms comply with its cash flow guidelines. Second, the terms suggested by defendant would result in either higher taxes on the sale proceeds or lower monthly payments for plaintiffs' retirement income than the original terms. In mid-August, 1977, plaintiffs cancelled the

sale because defendant would not approve the sale terms and would have refused to enter a joint venture agreement with the Eggens. Plaintiffs retained their interest in the motel and filed this action.

Plaintiffs' complaint stated, in relevant part:

"Defendant imposed additional terms and conditions to the sale which were not required under the July 1, 1961, agreement; that Defendant has failed and refused to enter into a joint venture agreement with Eggen thereby preventing the sale of Plaintiffs' interest.

"* * * * *

"That as a direct result of Defendant's failure and refusal to enter into a joint venture agreement with Eggen pursuant to the terms of the aforementioned written agreement dated July 1, 1961, Plaintiffs have been damaged in the sum of $50,000."

Defendant's motion for judgment asserted, in relevant part:

"On the basis of the facts as established at trial, defendant moves the court for judgment as a matter of law on the grounds that the evidence is insufficient to create a question of fact with respect to each of the following elements of plaintiffs' case:

"1.   The terms of the Joint Venture Agreement do not provide for review and approval of the terms of sale by TraveLodge.

"* * * * *

"3.   TraveLodge has no inherent right to review and approve the terms of sale.

"4.   TraveLodge's review in this instance was arbitrary.

"* * * * *

"7.   Plaintiffs have been damaged in fact by defendant's actions.

"8.   Plaintiffs have been damaged in an ascertainable amount as a result of defendant's actions.

"* * * * *"

The trial court denied the motion and entered a judgment for plaintiffs that stated, in part:

"The Court find[s], with regard to Plaintiffs' first cause of action, that the allegations of the Amended Complaint are true

and supported by the evidence, that Defendant breached its contract with Plaintiffs of July 1, 1961, by arbitrarily withholding its approval of Plaintiffs' buyers, and by arbitrarily refusing even to investigate said buyers, and by refusing to enter into a joint venture agreement with Plaintiffs' buyers, thereby preventing the sale of Plaintiffs' interest in the Grants Pass Travelodge; and

"The Court find[s] from the evidence that Plaintiffs have been thereby damaged in the sum of $21,000.00."

■ Because we are reviewing a denial of a motion for judgment as a matter of law, our view of the facts is governed by the following rules from *Starr v. Brotherhood's Relief,* 268 Or 66, 68-9, 518 P2d 1321 (1974) (review of a denial of a motion for a directed verdict):

"Because this is an action at law we must affirm the trial court if its findings are based upon any substantial evidence. In reviewing the evidence we must also bear in mind that in such a case plaintiff is entitled to have the evidence viewed in the light most favorable to him, including all reasonable inferences from the evidence and with all conflicts in the testimony resolved in his favor. *Archer v. Rogers Construction,* 252 Or 165, 169, 447 P2d 380 (1968)."

■ The trial court's finding that defendant breached the joint venture agreement is supported by substantial evidence. The agreement gave defendant the "right to investigate and approve of a buyer" of plaintiffs' interest if the approval was not "arbitrarily withheld." Defendant argues that this language is unambiguous and that it gives defendant the right to assure itself of a financially-sound partner by insisting that the sale terms conform to its cash flow guidelines. Plaintiffs argue that the agreement limited the criteria upon which defendant could disapprove of a buyer to the financial and personal characteristics of the buyer. Although the agreement does not specifically give defendant the right to approve of or impose terms of sale, it is arguable that the term "approve of a buyer" includes those rights. As we stated in *Bartlam v. Tikka,* 50 Or App 217, 220-21, 622 P2d 1133, *rev den* 290 Or 853 (1981):

"* * * Ambiguity is the effect of words that have either no definite sense or have more than one, causing the meaning of the writing to be 'not so clear as to preclude doubt by a reasonable man of its meaning.' " (Citations omitted.)

We conclude that this writing is ambiguous.

Rules of construction of contracts and the evidence here support the trial court's finding that defendant breached the agreement by arbitrarily withholding its approval of the Eggens.

"* * * Ambiguous contracts are usually construed against the party who drafts them. Silence on the subject of a right which the drafter later contends he has is usually fatal to his contention unless such right is one which necessarily results from the other terms of the contract. * * *" *Derenco v. Benj. Franklin Sav. and Loan,* 281 Or 533, 552, 577 P2d 477, *cert den* 439 US 1051 (1978).

Here, nothing in the joint venture agreement necessarily gives defendant the right to insist that the sale terms conform to its cash flow guidelines. We agree with defendant that the agreement gives it the right to withhold its approval if the buyer does not have the financial ability to comply with the sale terms agreed on by plaintiffs and the buyer. Here, however, resolving the conflicting testimony in plaintiffs' favor, Stone said that defendant would withhold approval of the Eggens, or any other buyer, unless the sale terms were changed to conform with its cash flow guidelines, regardless of the buyer's financial ability to comply with the original terms. Stone made this statement without having any knowledge of the Eggens' financial condition. Therefore, defendant's decisions to withhold its approval of the Eggens and its refusal to enter a joint venture agreement with them were arbitrary.

The other issue before us is whether defendant's breach caused plaintiffs any damage. Irene Shook testified that plaintiffs' 25 percent interest in the motel was worth $152,708 at the time of the breach, August, 1977, and $129,101 at the time of trial, September, 1980. Ernest McQueen, a commercial real estate broker, testified for plaintiffs as to the value of their interest. Using the "assessed value" method, he valued plaintiffs interest at $201,712 at breach and $141,519 at trial. Using the "annual return" method, he valued plaintiffs' interest at $191,564 at breach and $135,840 at trial.

The trial court awarded plaintiffs $21,000 in damages, apparently measured by the difference between the contract price ($150,000) and the fair market value of plaintiffs' interest at the time of trial (approximately $129,000 according to

plaintiffs). Defendant cites 5 Corbin, Contracts § 1098A (1964) for the proposition that, when a vendee breaches a contract for the sale of realty, the measure of damages is the difference between the contract price and the market value of the property valued at the time of the breach. Defendant argues from this that plaintiffs were not damaged, because the market value of plaintiffs' interest at the time of the breach was at least $152,708 and the contract price was only $150,000.

■■ Although defendant accurately states the rule for the measure of the vendor's damages after a vendee's breach, that rule does not apply here. The general principle of awarding damages for a breach of contract is to place the injured party in the same position he would have been in if the contract had been performed. *Stubblefield v. Montgomery Ward & Co.,* 163 Or 432, 448, 96 P2d 774, 98 P2d 14 (1939); *Kotan v. School Dist. No. 110C,* 13 Or App 139, 151, 509 P2d 452 (1973). The vendor/vendee rule is based on the assumption that, at the time of the breach, the vendor is able to sell the property to another party at its market value; therefore, a damage award measured by the difference between the contract price and the market value of the property at the time of the breach will place the vendor in the same position he would have been in if the vendee had purchased the property. *See* Restatement (Second) Contracts § 344, *comment b* at 104, § 350 *comment c* (1979). The nature of defendant's breach here, however, renders the substitute sale assumption invalid. Plaintiffs were entitled to sell their interest on terms that would minimize their tax liability and generate monthly payments of $1000 or more for retirement income. They did not want to sell their interest under terms that would not satisfy their two goals. Because defendant insisted that the terms of any sale conform with its cash flow guidelines, plaintiffs could not sell their interest to anyone under terms that would meet their goals until after trial. Therefore, the market value of plaintiffs' interest at the time of the breach has no relevance in the measuring of plaintiffs' damages.

■ Plaintiffs are entitled to recover as damages the benefit their bargain would have afforded them had defendant not frustrated that bargain by its breach of its contract with plaintiffs. To place plaintiffs in the same position they would have been in if the contract had been performed, the measure of damages is the amount plaintiffs lost as a result of defendant's breach, minus the amount plaintiffs gained and losses they

avoided by not selling their interest. *See* Restatement (Second) Contracts § 347 (1979).

The measure of damages apparently applied by the trial court, the sales price minus the market value at the time of trial, was incorrect. We remand on the present record for a redetermination of plaintiffs' damages.

Affirmed in part; reversed and remanded in part for determination of plaintiffs' damages.